**KimbleGrabb, P.L.L.C.**
7411 E. Tanque Verde Rd.
Tucson, Arizona  85715
Ph: 520.326.2500
KimbleLaw@aol.com

Attorneys and Plaintiffs and Counter Defendants

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

STEPHEN KIMBLE, an individual, and
ROBERT GRABB, an individual

Plaintiffs,

vs.

MARVEL ENTERPRISES, INC.,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CIV 08-372-TUC-DCB (DTF)

**COUNTER DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTER CLAIMANT'S FOURTH COUNTERCLAIM**

ORAL ARGUMENT REQUESTED

Counter Defendants move, pursuant to rule 56 of the Federal Rules of Civil Procedure, for Summary Judgment on Counter Claimant's 4th counterclaim, and for Summary Judgment regarding the issue of allocation for "multi-function" toys in general.  This *Motion* is supported by the attached *Memorandum of Points and Authorities* together with the accompanying *Statement of Facts.*

### Memorandum Of Points And Authorities

### Background

As the Court is now aware, Plaintiffs and Marvel Enterprises, Inc. entered into a settlement agreement (Agreement) to end litigation over the Web Blaster, a role

- 1 -

playing toy that permits the user to play the Spiderman character by shooting a foam

string web.  The Agreement was entered into on September 21, 2001 and is attached

to the accompanying Statement of Facts. (SOF 1)

The Agreement requires Marvel to pay Counter Defendants a royalty of 3% of

the net product sales of the toy.  Paragraph 3 of the Agreement sets forth the royalty

rate:

> b. 3% of "net product sales" (as such term is used in the Judgment)
> excluding refill royalties made after December 31, 2000.  For
> purposes of this paragraph 3.b, "net product sales" shall be
> deemed to include product sales that would infringe the Patent
> but for the purchase and sale thereof pursuant to this
> Agreement as well as sales of the Web Blaster product that was
> the subject of the Action and to which the Judgment refers.

The Agreement further obligates Marvel to provide quarterly reports detailing

net sales of the toys.  Paragraph 4 of the Agreement sets forth those reporting

requirements:

> Within 45 days after the calendar quarter ending September 30,
> 2001 and within 45 days after the end of each calendar quarter
> thereafter in which product sales are made Marvel will (i) submit to
> Kimble (on behalf of the Patent Holders) a report (the "Quarterly
> Royalty Report") covering net product sales made during such
> quarter which shall include the number of units of products sold, the
> price(s) at which such products were sold and a calculation of net
> product sales made during such quarter and (ii) remit payment to
> the Patent Holders of the amount shown as due in such Quarterly
> Royalty Report.

In addition, the Agreement also obligates Marvel to pay interest on any

overdue royalty payments.  Paragraph 4 of the Agreement further provides:

> Marvel will pay the Patent Holders interest on overdue payments at
> the lower of an annual rate of 2% over the prevailing prime interest
> rate and the rate of interest payable on judgments in the State of
> Arizona in effect on the date the payment was originally due.

The current litigation concerns the parties rights and obligations under the Agreement.  Since the inception of the Agreement, Marvel has been selling multi-function Web Blasters, i.e., toys that have various functions in addition to that of the basic Web Blaster. (SOF 2)  Four times a year for six years, Marvel provided quarterly reports and made payments that were based on 100% of the net product sales of the multi-function toys without exception and without objection.  (SOF 3)

Pursuant to the terms of the Agreement, a quarterly report and corresponding payment for the 3rd quarter of 2007 was due on November 15, 2007.  The report and accompanying payment was not received until November 28, 2007. (SOF 4)  Neither the report nor the payment included royalties for three multi-function products for which royalties were to be paid; the Ultimate Web Blaster, the Spiderman 3 Venom Mask & Wrist Blaster and the Spiderman 3 Reversible Red to Black Spiderman Mask and Web Blaster. (SOF 5)

On December 13, 2007, Counter Defendants made inquiry of Ken West, Defendant's Chief Financial Officer, as to why neither sales figures nor payment for one of those items, the Ultimate Web Blaster, was included. (SOF 6)  Marvel agreed to look into it. (SOF 7)  A week passed and there was no reply.  On December 20, 2007, Counter Defendants once again inquired of the missing sales and on that date, Marvel acknowledged that it had made a mistake and that "a check will be cut tomorrow for you and your claim." (SOF 8)

On January 5, 2008, Counter Defendants received Marvel's supplemental report and payment for what it contended was all royalties owed for the Ultimate Web Blaster. (SOF 9)  The payment, however, was not based on 100% of the net

product sales of the Ultimate Web Blaster, but rather on 20%. (SOF 10)  For the first time since the inception of the Agreement, Marvel had taken the position that it would not pay royalties for multi-function toys based on 100% of the toys net product sales.  Marvel claimed that since the Ultimate Web Blaster was a multi-function toy that shot not only a foam web, but darts, missiles, water, and a sticky blob, full payment to Plaintiffs was only 20% of what was called for by the Agreement.

On January 7, 2008, Counter Defendants contested Marvel's position and further asked for an assurance that no other royalty payments were owed. (SOF 11) The following day Marvel reiterated its stance that since the Ultimate Web Blaster had five functions and none of the five functions was more important than any of the others, Counter Defendants were entitled to royalties based on only 1/5 of the products net sales. (SOF 12) It failed to respond to the inquiry of other royalty payments being owed.  Counterclaimants acknowledged the difference of opinion about payment for the Ultimate Web Blaster and again pressed Mr. Kent for an assurance that no other royalties were owed. (SOF 13)  On January 9, 2008, Mr. West responded saying "I have confirmed with Accounting that all applicable toy sales have been reported." (SOF 14)

Again, Marvel was wrong.  On January 9, 2008, Counter Defendants specifically inquired about the two other toys that were being sold (the Spiderman 3 Venom Mask & Wrist Blaster and the Spiderman 3 Reversible Red to Black Spiderman Mask and Web Blaster) and demanded payment for those multi-function toys. (SOF 15)  Counter Defendants also continued to contest Marvel's deduction for the Ultimate Web Blaster.  (SOF 15)

That same day Marvel acknowledged that a mistake had been made with respect to these two toys as well (SOF 16) and on January 24, 2008 issued payment for those toys. (SOF 16)  Marvel refused, however, to make full payment for the Ultimate Web Blaster.

Through January, 2008, the parties continued to argue their positions on payment for the Ultimate Web Blaster.  On January 9 and 14, 2008, Counter Defendants argued that the royalty payments should be calculated on 100% of net product sales. (SOF 17)  Each time Marvel argued that the 20% payment was fair. (SOF 17)

Counter Defendants urged Counter Claimant to review in detail the terms of the written Agreement. (SOF 18)  On January 25, 2008, although acknowledging "the terms of the settlement are clearly in your favor", Mr. West nevertheless maintained Marvel's position that it owed only 20% of the net product sales, not 100%. (SOF 19)

On January 28, 2008, Counter Defendants again argued that Marvel should pay based on 100% of net product sales. (SOF 20)  Later that day, Mr. West informed Counter Defendants that "because I was not a party to the prior negotiations that lead up to the settlement, I took it upon myself to render what I considered fair.  In light of your numerous emails, we will make full payment to you later this week".  Marvel agreed to make full payment based on 100% of net product sales later that week. (SOF 21)

On February 20, 2008 Plaintiffs received a supplemental payment reflecting the remaining 80% of "net product sales" of the Ultimate Web Blaster. (SOF 22)

Though the payment was nine months overdue, and though the Agreement provided that interest accrued at 2% over the prime interest rate on all overdue payments, no interest was included in the payment and no interest has ever been paid.  It is against this background that we turn to the Marvel's Fourth counterclaim.

It's Fourth counterclaim alleges that:

60.   By mistake, in respect of calendar year 2007 Marvel paid plaintiffs based on the total price of products consisting of improved Web Blasters which perform various additional functions in addition to that of the basic Web Blaster.
61.   Marvel believes that for these improved Web Blaster products, it should only be required to pay plaintiffs based on the percentage of the total price of the product attributable to the function of the basic Web Blaster.
62.   As a result of Marvel's mistaken failure to exclude the price of extra functions of the improved Web Blaster products in respect of calendar year 2007, plaintiffs have been over paid and unjustly enriched.

As the Court will see, contrary to Marvel's allegations, there was no "mistaken failure" by Marvel to exclude the price of extra functions.  First, the plain language of the Agreement supports a finding that Marvel is not permitted to decrease payments because of added functions of the Web Blaster.  Second, the course of performance by the parties over the last six years supports a finding that Marvel is not now entitled to decrease payments because of added functions of the Web blaster.  Finally, the parties have already thoroughly vetted and resolved this issue wherein Marvel agreed not to seek a deduction for added functions.  Each is discussed below.

## Legal Analysis

### Plain Language of the Agreement

When interpreting a contract, the court looks first at the plain language of the

contract.  The language of the Agreement at issue states that Counter Claimant is to pay Counter Defendant "3% of 'net product sales'".  Nowhere in the Agreement is there any provision for either an allocation or reduction of payments based on extra functions of improved versions of the Web Blaster.  Multi-function toys, such as the Ultimate Web Blaster, may be, as Counter Claimant itself states in paragraph 61 of its Answer and Amended Counter claims, "improved Web Blaster products", but they are "products" nevertheless.

Where, as here, an agreement "is complete, clear and unambiguous on its face [, it] must be enforced according to the plain meaning of its terms. . ." *Greenfield v. Philles Records, Inc.*, 98 NY2d 562 (2002).  The plain meaning of the terms of the agreement requires Marvel to pay plaintiffs 3% of net product sales, not 3% of something less than net product sales.

## Course Of Performance

If, after reviewing the language of the Agreement there remains a question of interpretation, the courts look at the parties' prior course of dealings. (Restatement 2nd of Contracts, §203)  In *Fed. Ins. Co. v. Ams. Ins. Co.*, 691 N.Y.S.2d 508, 258 A.D.2d 39 at 44 [1st Dept 1999], the Courts of New York recognize that past performance is important in gleaning the intent of parties.

> [T]he parties' course of performance under the contract is considered to be the "most persuasive evidence of the agreed intention of the parties." (*Webster's Red Seal Publs. v. Gilberton World-Wide Publs.*, 67 A.D.2d 339, 341, *affd* 53 N.Y.2d 643.) "Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." (*Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118; *see, IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 [2d Cir], cert denied 514 U.S. 1014.) As

1
2

Restatement (Second) of Contracts § 202, comment g has expressed it, "The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.

3
4

Counter Defendant and Counter Claimant have established a long history of

5

performance under the Agreement.  Since its inception almost eight years ago,

6

Marvel has been selling multi-function toys and has consistently and without

7

exception paid Plaintiffs full royalties for those multi-function toys.  These royalties

8

have **always** been based on 100% of the net product sales of these toys.  Now, eight

9

years into the contract, Marvel wants to change the rules.

10

This extensive history of performance is a clear and unambiguous reflection

11

of the parties understanding of their obligations.

12

**Accord and Satisfaction and/or Settlement**

13

As was detailed above, for nine months Marvel withheld monies for the

14

Ultimate Web Blaster.  For two months, the parties argued their respective positions

15

on payment for multi-function.  Finally, on January 25, 2008 Marvel reviewing the

16

Agreement in detail wrote sating that "We agree with you that the terms of the

17

settlement are clearly in your favor …".  Three days later Marvel followed up writing

18

"in light of the numerous emails, we will make full payment to you later this week".

19

Shortly thereafter, full payment was in fact made.  It is disingenuous for Marvel to now

20

argue that this payment, made after weeks of negotiations, was a mistake.

21

The parties thoroughly addressed and ultimately resolved the issue regarding

22

payment for multi-function toys.   There was, therefore, either an accord and

23

satisfaction or a settlement.

24
25

1

2

The court in *Patel v. Orma*, 593 N.Y.S.2d 851, 190 A.D.2d 782 at 783 [2d

Dept 1993] stated:

3

4

5

> As a general rule, acceptance of a check in full settlement of a
> disputed or unliquidated claim operates as an accord and
> satisfaction discharging the claim *(see, Merrill Lynch Realty/Carll
> Burr,Inc. v Skinner*, 63 N.Y.2d 590; *Nassoiy v Tomlinson*, 148 N.Y.
> 326).

6

7

8

9

There is no question that there was a dispute between the parties and the

dispute was resolved with Counter Defendants giving up its claim to interest on the

late payment and Marvel giving up its claim that it is entitled to a reduction for multi-

function.

10

## Conclusion

11

12

13

14

15

16

17

18

19

20

21

The clear language of the Agreement does not permit Marvel to deduct

payments because of multi-function.  The prior dealings of the parties reflect that

neither intended there to be a reduction of payments because of multi-function.  The

parties have already vetted and resolved the issue of reduction for multi-function.

For each of the foregoing reasons, Counter Defendants respectfully request this

Court grant their Motion for Summary Judgment on Defendant's fourth counterclaim,

and rule that the Agreement obligates Counter Claimant to pay Counter Defendant a

3% royalty on 100% of the net product sales of multi-function toys.    Counter

Defendant further requests they be awarded their reasonable attorneys' fees

pursuant to the Agreement.

22

Dated this 29th  day of June, 2009

23

24

25

**KimbleGrabb, PLLC**

by  s/Robert Grabb

Robert Grabb, Esq.
Attorneys for <u>Counter Defendant</u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 29, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Andrew Jacobs
Snell & Wilmer, LLP
ajacobs@swlaw.com

Joe Kroeger
Snell & Wilmer, LLP
jkroeger@swlaw.com

David Fleischer
Paul, Hastings, Hanofsky & Walker LLP
davidfleischer@paulhastings.com

s/Robert Grabb