**KimbleGrabb, P.L.L.C.**
7411 E. Tanque Verde Rd.
Tucson, Arizona  85715
Ph: 520.326.2500
KimbleLaw@aol.com

Attorneys / Plaintiffs / Counter Defendants

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| STEPHEN KIMBLE, an individual, and ROBERT GRABB, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>MARVEL ENTERPRISES, INC.,<br><br>Defendant. | Case No. CIV 08-372-TUC-DCB (DTF)<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE DEFINITION OF NET PRODUCT SALES**<br><br>ORAL ARGUMENT REQUESTED |

Plaintiffs move, pursuant to rule 56 of the Federal Rules of Civil Procedure, for Summary Judgment regarding the definition of "net product sales".  This *Motion* is supported by the attached *Memorandum of Points and Authorities* together with the accompanying *Statement of Facts.*

### Memorandum Of Points And Authorities

### Introduction

To end litigation between the parties, in 2001 Plaintiffs and Defendant Marvel entered into a settlement agreement (Agreement).  The Agreement requires Marvel to

make royalty payments for certain toys based on their "net product sales".  The parties understood "net product sales" to mean 93% of gross sales.  For more than six years the parties operated under that understanding without difficulty.  In 2006 Defendant Marvel entered into a license agreement with Hasbro, Inc., that went into effect in 2007.  Since that time a dispute has arisen between Plaintiffs and Defendant as to the definition of "net product sales".  This *Motion for Summary Judgment* seeks a declaration that "net product sales" is defined as 93% of gross product sales.

**Facts**

In 2001, Plaintiffs and the Defendant Marvel entered into a contract that requires Marvel to pay a royalty of 3% of the net product sales for certain toys. (SOF 1)  The Agreement, however, does not define "net product sales" but rather identifies it "as that term is used in the Judgment".  Unfortunately, the Judgment also fails to define "net product sales". (SOF 2)

The parties, however, have not been without guidance.  In the underlying litigation, David Fremed, Chief Financial Officer of the Toy Biz division of Marvel, testified that "net product sales" was defined as 93% of gross product sales. (SOF 3)  There was no conflicting testimony.  When it came time to execute the Agreement, Plaintiffs understood, based on this uncontested testimony, that "net product sales" meant 93% of gross product sales. (SOF 4)

Four times a year for almost seven years, Marvel provided quarterly reports of the net sales of these products. (SOF 5)  Each and every time, Marvel used 93% of the gross sales as the definition of "net product sales". (SOF 6)  Each and every time, Marvel made the corresponding royalty payments, without exception, and without

objection, using this definition of "net product sales". (SOF 7)

In 2006, Marvel entered into a licensing agreement effective 2007 with Hasbro Inc, a toy manufacturer. (SOF 8)  The agreement permitted Hasbro to manufacture the Marvel line of toys, including the Web Blaster. (SOF 9)  In exchange, Marvel would receive a percentage of Hasbro's net product sales. (SOF 10)  In the negotiations, Marvel intended to have Hasbro execute a Toy Technology Sublicense Agreement (T.T.S.A.) that would have obligated Hasbro to assume Marvel's financial obligations to Plaintiffs under the Agreement. (SOF 11)  Marvel provided Hasbro with a copy of the T.T.S.A., as well as a copy of the Kimble / Marvel settlement agreement and assignment. (SOF 12)

In 2007, Marvel became aware that, through inadvertence, oversight or neglect, Hasbro never signed the T.T.S.A. (SOF 13)  As a result Marvel remained obligated to pay Plaintiffs under the Agreement.  Marvel thereafter attempted to have Hasbro sign the TTSA, but Hasbro refused saying it was "not appropriate for us to sign – particularly [agreements] that on the surface seem to suggest that Hasbro should make further payments." (SOF 14)

Hasbro never signed the TTSA (15), and thereafter, Marvel began a campaign to minimize its financial obligations to Plaintiffs by deducting for multi-function and for added items, and started using a different definition of "net product sales" that lowered the payments to Counter Defendants. (SOF 16)

**Legal Analysis**

Since the inception of the Agreement, all parties have abided by the definition of "net product sales" as testified to by David Fremed, Marvel's own Chief

Financial Officer.

> Q. (By Mr. Kimble) Are you aware that net sales is a term that you use in calculating payments to inventors who have signed license agreements?
> A. (My Mr. Fremed)  Yes.
> Q.  When you use that term, what does that mean to you?
> A.  Net sales is usually invoiced sales less a P&L allowance.
> Q.  Invoiced sales less a P&L allowance?
> A.  Yes.
> Q.  Can you explain to me what the P&L allowance is?
> A.   Different customers have different terms for what – how they want to take their discount or how they get to their net pricing.  Some customers will ask for net pricing totally off of invoice, other customers might ask us to invoice them list price and take allowance or deductions later on in the year or the year-end, and some customers might take a combination of both.
> Therefore, an invoice amount to a customer is not really the net sale amount to the customer.  We have computed based on historical information an allowance that we take off of invoiced sales of 7 percent, and that is what we use as the P&L allowance.
> Q. You use 7 percent as the – as a fixed P&L allowance when calculating the net sales?
> A. That's correct.
> Q. How long have you been using 7 percent as the P&L allowance?
> A. A long time.  I don't' remember when it started.
> Q. Was it – was it that when you joined Toy Biz?
> A. I don't recall.
> Q. Has there ever been an occasion when an inventor has contested you use of 7 percent as a reasonable P&L allowance in calculating the net sales?
> A. I don't know if you say contested but they have inquired and upon explanation of what the 7 percent is, they have been satisfied with it.

(SOF 3)

It was against this backdrop that the parties executed the Agreement.  They then operated under the Agreement using 93% of gross product sales as the definition of "net product sales" for more than six years.

The testimony of the principles as well as the conduct of the parties clearly demonstrates that all involved knew that "net product sales", pursuant to the Agreement, meant 93% of gross products sales.

In *Fed. Ins. Co. v. Ams. Ins. Co.*, 691 N.Y.S.2d 508, 258 A.D.2d 39 at 44 [1st Dept 1999], the court addressed the issue of contract construction, and is dispositive to the issue now before this Court. It held,

> Furthermore, the parties' course of performance under the contract is considered to be the "most persuasive evidence of the agreed intention of the parties." (*Webster's Red Seal Publs. v. Gilberton World-Wide Publs.*, 67 A.D.2d 339, 341, *affd* 53 N.Y.2d 643.) "Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." (*Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118; *see, IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 [2d Cir], cert denied 514 U.S. 1014.) As Restatement (Second) of Contracts § 202, comment g has expressed it, "The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."

This course of performance, this practical interpretation of the Agreement for more than 6 years, clearly demonstrates that the definition of "net product sales" is 93% of gross product sales.

**Conclusion**

David Fremed's testimony in the in the earlier case, Plaintiffs' understanding of the definition of "net product sales" upon executing the Agreement and the course of performance for more than six years clearly reflects the intent of the parties that the definition of "net product sales" is 93% of gross product sales.

Plaintiffs respectfully request this Court grant this Motion for Summary

Judgment and award Plaintiffs their reasonable attorney fees.

Dated this 8th day of July, 2009

**KimbleGrabb, PLLC**

by  s/Robert Grabb

Robert Grabb, Esq.
Attorneys / Plaintiffs / Counter Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8th 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Andrew Jacobs
Snell & Wilmer, LLP
ajacobs@swlaw.com


Joe Kroeger
Snell & Wilmer, LLP
jkroeger@swlaw.com


David Fleischer
Paul, Hastings, Hanofsky & Walker LLP
davidfleischer@paulhastings.com


s/Robert Grabb