1   David Fleischer (*pro hac vice*)
    PAUL, HASTINGS, JANOFSKY & WALKER LLP
2   75 East 55th Street
    New York, NY 10022
3   Telephone:  (212) 318-6000
    davidfleischer@paulhastings.com
4
    Andrew M. Jacobs (AZ Bar. No. 021146)
5   Joseph A. Kroeger (AZ Bar. No. 026036)
    SNELL & WILMER L.L.P.
6   One South Church Avenue
    Suite 1500
7   Tucson, Arizona  85701-1630
    Telephone:  (520) 882-1207
8   ajacobs@swlaw.com
    jkroeger@swlaw.com
9
    Attorneys for Defendant
10
11                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ARIZONA
12  STEPHEN KIMBLE, an individual, and        CASE NO. CV 08-372-TUC-DCB(DTF)
    ROBERT GRABB, an individual,
13                                            **DEFENDANT'S OPPOSITION TO**
                 Plaintiffs,                  **PLAINTIFFS' MOTIONS FOR**
14                                            **SUMMARY JUDGMENT**
         vs.
15  MARVEL ENTERPRISES, INC.,                 ORAL ARGUMENT REQUESTED
16               Defendant.
17
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF CONTENTS

2

Page

3   INTRODUCTION ................................................................................................ 1

I.    BACKGROUND AND RELEVANT FACTS .......................................... 2

4
      A.    Facts leading up to the Agreement ............................................. 3

5     B.    The Agreement ............................................................................. 3

6     C.    Hasbro License Agreement .......................................................... 4

      D.    The current lawsuit and procedural history ................................. 6
7
ARGUMENT ...................................................................................................... 7

8   II.   LEGAL STANDARDS ........................................................................... 7

9     A.    Standard for granting summary judgment under Rule 56 ........... 7

      B.    Summary judgment involving contracts governed by New York law ................... 8
10
III.  SINCE JANUARY 1, 2007, MARVEL HAS OWED PLAINTIFFS NO
11    ROYALTIES BECAUSE IT HAD ZERO NET PRODUCT SALES
      (PLAINTIFFS' FIRST MOTION) ........................................................... 9
12
      A.    The plain language of the Agreement indicates that the term "net product
            sales" only includes Marvel's net product sales, not third-party sales .................. 9
13
      B.    The HLA is irrelevant to interpreting the Agreement ............................ 12
14
      C.    The plain language of the Agreement precludes any inquiry on summary
            judgment as to whether "net product sales" includes sales for multi-
15          function and extra-value items and whether it should be interpreted as 93%
            of gross product sales. ................................................................ 14
16
IV.   IF THIS COURT DETERMINES THAT THE TERM "NET PRODUCT SALES"
17    IS AMBIGUOUS, PLAINTIFFS' NON-PATENT SUMMARY   JUDGMENT
      MOTIONS MUST BE DENIED ............................................................. 15
18
      A.    Plaintiffs' non-patent motions for summary judgment regarding the phrase
19          "net product sales" must be denied if the term "net product sales" is found
            to be ambiguous ......................................................................... 15
20    B.    Reliance on a party's course of performance to interpret an ambiguous term
            in the Agreement necessitates a factual inquiry ............................... 16
21    C.    Disputed issues of material fact preclude the grant of summary judgment to
            plaintiffs ..................................................................................... 17
22
            1.    Disputed issues of material fact preclude granting plaintiffs' first
23                motion for summary judgment .............................................. 18

24          2.    Issues of disputed material fact preclude granting plaintiffs' second
                  motion for summary judgment .............................................. 19
25
            3.    Disputed issues of material fact preclude granting plaintiffs' fourth
26                motion for summary judgment .............................................. 22

            4.    Issues of disputed material fact preclude granting plaintiffs' fifth
27                motion for summary judgment .............................................. 23

CONCLUSION ................................................................................................ 24

28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Express Bank, Ltd. v. Uniroyal, Inc.*,
    164 A.D.2d 275, 562 N.Y.S.2d 613 (1st Dep't 1990) ........................................ 9, 16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................................... 8

*Bose Corp. v. Linear Design Labs, Inc.*,
    467 F.2d 304 (2d Cir. 1972) ........................................................................ 13

*Brainard v. New York C. R. Co.*,
    242 N.Y. 125, 151 N.E. 152 (1926) ............................................................. 16

*Breed v. Ins. Co. of N. Am.*,
    46 N.Y.2d 351, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (1978) ........................ 8

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................. 7, 8

*Eisenberg v. Ins. Co. of N. Am.*,
    815 F.2d 1285 (9th Cir. 1987) ...................................................................... 8

*Hartford Accident & Indem. Co. v. Wesolowski*,
    33 N.Y.2d 169, 305 N.E.2d 907, 350 N.Y. S.2d 895 (1973) ........................ 8

*Hudson-Port Ewen Assocs., L.P. v. Kuo*,
    78 N.Y.2d 944, 578 N.E.2d 435, 573 N.Y.S.2d 637 (1991) ...................... 8, 11

*In re Mogen David Wine Corp.*,
    328 F.2d 925 (C.C.P.A. 1964) .................................................................... 12

*Janos v. Peck*,
    251 N.Y.S.2d 254 (1st Dep't 1964), *aff'd*, 15 N.Y.2d 509, 202 N.E.2d 560, 254
    N.Y.S.2d 115 (1964) ............................................................................... 9, 16

*Jellinick v. Joseph J. Naples & Assocs. Inc.*,
    296 A.D.2d 75, 744 N.Y.S.2d 610 (4th Dep't 2002) ............................. 9, 14, 15

*Jones v. Am. Law Book Co.*,
    125 A.D. 519, 109 N.Y.S. 706 (1st Dep't 1908) ....................................... 16

*Kass v. Kass*,
    91 N.Y.2d 554, 696 N.E.2d 174, 673 N.Y.S.2d 350 (1998) ....................... 8

*Kaung v. Board of Managers of Biltmore Towers Condo. Ass'n*,
    22 Misc. 3d 854, 873 N.Y.S.2d 421 (Sup. Ct. 2008) ................................................................. 8

*Nichols v. Nichols*,
    306 N.Y. 490, 119 N.E.2d 351 (1954) ...................................................................................... 8

*Old Colony Trust Co. v. City of Omaha*,
    230 U.S. 100 (1913) ................................................................................................................ 16

*Pachmayr Gun Works, Inc. v. Olin Mathieson Chem. Corp., Winchester W. Div.*,
    502 F.2d 802 (9th Cir. 1974) .................................................................................................. 12

*Patel v. Orma*,
    190 A.D.2d 782, 593 N.Y.S.2d 851 (2d Dep't 1993) ............................................................. 21

*Taylor Instruments Cos. v. Fawley-Brost Co.*,
    139 F.2d 98 (7th Cir. 1943) .................................................................................................... 13

*Welles v. Turner Entm't Co.*,
    503 F.3d 728 (9th Cir. 2007) .......................................................................................... 8, 9, 16

**OTHER AUTHORITIES**

11 Richard A. Lord, Williston on Contracts § 33:3 (4th ed. 2009) ................................................ 8

FED. R. CIV. P. 56(a) ...................................................................................................................... 7

FED. R. CIV. P. 56(c) ...................................................................................................................... 7

-iii-

1   For the reasons in the accompanying Memorandum of Points and

2   Authorities, defendant Marvel Entertainment, Inc. ("Marvel") respectfully requests this

3   Court to deny each of plaintiffs' motions for summary judgment.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

<u>**INTRODUCTION**</u>

7   Plaintiffs Stephen Kimble ("Kimble") and Robert Grabb ("Grabb") have

8   filed a total of five motions for summary judgment,[1] four of which concern the meaning of

9   the term "net product sales" as used in an agreement dated September 21, 2001 (the

10   "Agreement").[2]  The threshold issue for each of the non-patent motions is "whose" net

11   product sales the Agreement was intended to cover.

12   Marvel contends that the plain language of the Agreement indicates that it is

13   only Marvel's net product sales that trigger royalty payment obligations and that net

14   product sales of any third-party such as Hasbro do not trigger any royalty payment

15   obligations.  If the Court agrees and were to determine that Marvel's royalty payment

_____

[1] These are plaintiffs' first motion for summary judgment filed on June 12, 2009 (Doc. No. 47); plaintiffs' second motion for summary judgment filed on June 29, 2009 (Doc. No. 48), plaintiffs' fourth motion for summary judgment filed on July 6, 2009 (Doc. No. 50), and plaintiffs fifth motion for summary judgment filed on July 8, 2009 (Doc. No. 51), collectively the "non-patent motions."  Plaintiffs' third motion for summary judgment filed on July 1, 2009 seeks a declaration that Marvel is obligated to pay royalties pursuant to the Agreement even after the Kimble patent expires.  (ASOF ¶ 42).  On July 15, 2009, Marvel filed its own motion for summary judgment on its counterclaim seeking a declaration that it does not have an obligation to pay royalties after the Kimble patent expires.  (*See* Doc. No. 54).  Marvel hereby opposes plaintiffs' third motion for summary judgment, by incorporating Marvel's July 15, 2009 Motion and Memorandum of Points and Authorities (Doc. No. 54) by reference as if set forth in its entirety herein.  Accordingly, Marvel will not address plaintiffs' third motion in any additional detail herein.

[2] Each of plaintiffs' non-patent motions are focused on the meaning of the term "net product sales" and all concern similar legal and factual issues.  For example, plaintiffs argue "course of performance" in three of the four motions relying on the same legal precedent.  In order to attempt to avoid burdening the Court with multiple sets of papers, Marvel filed this consolidated response to plaintiffs' motions to expedite consideration by the Court.

1    obligations under the Agreement are triggered only by Marvel's "net product sales," all of

2    plaintiffs' non-patent motions would have to be denied as moot because Marvel has not

3    sold any toy products since January 1, 2007.

4              Indeed, even if the Court were to determine that the language of the

5    Agreement is unclear and ambiguous with respect to whether Marvel's royalty payment

6    obligations are triggered by a third-party's "net product sales," all of plaintiffs' non-patent

7    motions would still have to be denied because the resolution of that ambiguity would

8    necessarily require resort to extrinsic evidence implicating disputed issues of material fact

9    that cannot be decided in the context of a motion for summary judgment.  In addition, a

10   host of disputed issues of material fact would need to be resolved in order to grant

11   plaintiffs' non-patent motions including:  (1) whether the term "net product sales"

12   includes the full sales value of multi-function Ultimate Web Blasters, (2) whether the term

13   "net product sales" includes the full sales value of kits containing basic a Web Blaster

14   together with various other items such as a water tank or a Spider-Man mask; and (3)

15   whether the term "net product sales" as used in the Agreement means "93% of gross

16   product sales."  As demonstrated below, plaintiffs' non-patent motions rely on many

17   factual assertions as to which there is real dispute that simply cannot be resolved in

18   plaintiffs' favor without a trial.

19   **I.    BACKGROUND AND RELEVANT FACTS**

20

21              Plaintiffs brought this action for damages arising from the alleged breach of

     the Agreement by Marvel, for failing to pay what they contend is the proper amount of

22   royalties due on sales of Web Blaster toys for the period January 1, 2007 and forward.

23
     (July 15 SOF ¶¶ 13-18)[3].  The Web Blaster is a role play toy whose primary play value is
24
     to allow the user to adopt aspects of Marvel's Spider-Man character by shooting foam
25

26   _____

     [3] "July 15 SOF" refers to the Statement of Material Facts in Support of Defendant's
27   Motion for Summary Judgment filed on July 15, 2009, Doc. No. 55.

28

string.  (July 15 SOF ¶ 4).  The Agreement provides certain rights to Marvel, including rights under U.S. Patent No. 5,072,856 (the "Kimble patent"), in exchange for Marvel paying a royalty of "3% of 'net product sales'" of certain Web Blaster toys.  (July 15 SOF ¶ 8).

### A.   Facts leading up to the Agreement

In a prior action, *Stephen E. Kimble v. Toy Biz, Inc.*, C.A. No. CV-97-557-TUC-RCC, commenced in this Court, Kimble sued Marvel (then known as Toy Biz, Inc.) for infringement of the Kimble patent and for breach of an alleged oral agreement.  (July 15 SOF ¶ 3).  The oral agreement was allegedly made between the parties at a meeting in 1990 after a patent application was filed, but prior to issuance of the Kimble patent.  (*Id.*).  In that suit, this Court held that Marvel did not infringe the Kimble patent, although a jury determined that Marvel had breached the alleged oral agreement with Kimble concerning the Web Blaster.  (July 15 SOF ¶¶ 5-6).  The Court entered a judgment (the "Judgment") in Kimble's favor on October 10, 2000, awarding Kimble "3.5% of net product sales, past, present and future excluding refill royalties."  (July 15 SOF ¶ 6).  Marvel appealed the Judgment with respect to the claimed breach of contract, and Kimble appealed this Court's holding of non-infringement with respect to the Kimble patent claim.  (July 15 SOF ¶ 7).  While both appeals were pending, and before the Judgment became final, the parties settled their disputes (including the non-final patent dispute and the non-final oral agreement dispute) by entering into the Agreement).  (*Id.*).

### B.   The Agreement

Under the Agreement, plaintiffs assigned the Kimble patent to Marvel, and Marvel made a lump sum payment of $516,214.62 and agreed to pay plaintiffs 3% of Marvel's "net product sales" of (1) products "that would infringe the [Kimble] patent but for the purchase and sale thereof pursuant to this Agreement"; and (2) "Web Blaster product that was the subject of the Action."  (July 15 SOF ¶ 8).  By its terms, the Agreement is governed by New York law.  (July 15 SOF ¶ 11).  The Agreement also

-3-

1   provided:  "This agreement shall be binding upon and inure to the benefit of the parties

2   hereto and their respective heirs, administrators, executors, successors and assigns."

3   (ASOF ¶ 5).[4]

4          Prior to 2007, Marvel had manufactured various versions of the Web Blaster

5   and had paid 3% royalties on a quarterly basis.  (RSOF #4 ¶ 5).  More precisely, Marvel

6   made two payments in 2001 and quarterly payments from 2002 to 2006.[5]  (*Id.*).  Marvel

7   paid 3% royalties on 93% of the invoiced sale of the Web Blasters, taking 7% off as a

8   "P&L allowance."[6]  (ASOF ¶ 10).  During this period, the products on which Marvel paid

9   3% royalties were Web Blasters, some of which were sold with extra-value items.  (ASOF

10  ¶ 11).  Marvel has never made or sold a multi-function Web Blaster as Marvel has

11  consistently used that term in this litigation.  (*Id.*).

12      **C.    Hasbro License Agreement**

13

14         On January 6, 2006, Marvel entered into a license agreement with Hasbro,

15  Inc. ("Hasbro"), granting Hasbro the copyright and trademark rights to use Marvel's

16  characters (including Spider-Man) in manufacturing and selling specific categories of

17  goods, including role play toys such as the Web Blaster (the "HLA").  (SOF #4 ¶ 8).  The

18  _____

19  [4] "ASOF" refers to Defendant's Additional Statement of Facts Establishing a Genuine
    Issue of Material Fact And/Or Precluding Summary Judgment In Favor of Plaintiffs filed
    concurrently herewith.  "SOF #1" refers to Plaintiffs' June 12, 2009 Statement of Facts,
20  Doc. No. 47-2. "RSOF #1" refers to the Response to SOF #1, filed concurrently herewith.
    "SOF #2" refers to Plaintiffs' June 29, 2009 Statement of Facts, Doc. No. 48-2.  "RSOF
21  #2" refers to the Response to SOF #2, filed concurrently herewith. "SOF #3" refers to
    Plaintiffs' July 1, 2009 Statement of Facts, Doc. No. 49-2.  "RSOF #4" refers to the
22  Response to SOF #3, filed concurrently herewith. "SOF #4" refers to Plaintiffs' July 6,
    2009 Statement of Facts, Doc. No. 50-2.  "RSOF #4" refers to the Response to SOF #4,
23  filed concurrently herewith. "SOF #5" refers to Plaintiffs' July 8, 2009 Statement of Facts,
    Doc. No. 51-2. "RSOF #5" refers to the Response to SOF #5, filed concurrently herewith.

24  [5] Marvel mistakenly paid 3% royalties on Hasbro's sales in 2007.  (ASOF ¶ 26).

25  [6] The "P&L allowance" accounts for customers' preference as to "how they want to take
    their discount or how they get to their net pricing."  (ASOF ¶ 10).  "Some customers will
26  ask for net pricing totally off of invoice, other customers might ask [Marvel] to invoice
    them list price and take allowance or deductions later on in the year or the year-end, and
27  some customers might take a combination of both."  (*Id.*).

28

HLA became effective on January 1, 2007.  (SOF #4 ¶ 8).  The HLA provides that "[Marvel] hereby reserves all rights not specifically granted to [Hasbro]."  (ASOF ¶ 17).  Marvel receives 10% of Hasbro's net sales in consideration of the rights to use Marvel's trademarks and copyrights in conjunction with various toys under the terms of the HLA.  (ASOF ¶ 13).  Marvel itself has not manufactured or sold Web Blasters since prior to 2007.  (ASOF ¶ 21).

Seven months after entering into the HLA, Marvel offered Hasbro an opportunity to execute a Toy Technology Sublicense Agreement (the "T.T.S.A.") which would have granted Hasbro various toy technologies, including the rights under the Agreement, as well as musical rights.  (ASOF ¶ 18).  Hasbro did not need the actual technology and declined Marvel's offer to sublicense the Kimble technology.  (*Id.*).

Beginning in 2007, Hasbro began to manufacture and sell Web Blasters associated with Spider-Man.  (ASOF ¶ 22).  As Marvel had done, Hasbro sold Web Blasters by themselves and sometimes packaged them with extra-value items.  (ASOF ¶ 23).  Further, Hasbro introduced an improved multi-function version of the Web Blaster called the Ultimate Web Blaster.  (ASOF ¶ 23).  The Ultimate Web Blaster features five different functions, only one of which involves rights that may be covered by the Agreement.  (*Id.*).

For each calendar quarter, Hasbro reports sales data to Marvel, including the number of units sold and the prices at which such products were sold because it has to pay 10% royalty on its sales to Marvel.  (ASOF ¶ 25).  Out of habit, upon receipt of such data, Marvel continued to pay plaintiffs 3% of the sales made by Hasbro by mistake, which increased plaintiffs' royalties as a portion of Marvel's revenues by a factor of ten.  (ASOF ¶¶ 26, 40).  After plaintiffs raised questions about Marvel's royalty payments, Marvel realized that it was entitled to base royalties on 20% of the sales from Ultimate Web Blasters because it featured five functions, four of which have nothing to do with rights under the Agreement.  (ASOF ¶ 27).  After plaintiffs "exercised their right to audit Marvel," Marvel realized that it had also been paying more royalties than it owed

plaintiffs with respect to the extra-value items.  (July 15 SOF ¶ 13; ASOF ¶ 34).

        Marvel began to offset the 3% royalty payments against its previous overpayment to plaintiffs,[7] precipitating this action.  (ASOF ¶ 39).  After Marvel further scrutinized the Agreement, Marvel realized that the Agreement did not call for royalties to be paid on Hasbro's sales of the Web Blasters at all.  (ASOF ¶ 40).  In the spirit of good faith and equity, Marvel then began crediting plaintiffs with an amount equal to 3% of the royalty stream Marvel was receiving from Hasbro for using Marvel's copyrights and trademarks in conjunction with Web Blaster sales.  (ASOF ¶ 41).

### D.    The current lawsuit and procedural history

        On May 28, 2008, plaintiffs sued Marvel in Pima County Superior Court. (July 15 SOF ¶ 14).  On June 27, 2008, Marvel removed the action to this Court and thereafter filed an answer and counterclaims.  (July 15 SOF ¶ 15).  On November 14, 2008, plaintiffs filed the first amended complaint.  (July 15 SOF ¶ 16).  In response, Marvel filed a motion to dismiss three counts in plaintiffs' complaint.  Plaintiffs then agreed to dismiss these improper counts without filing a response to Marvel's motion. (July 15 SOF ¶ 17).  On January 26, 2009, Marvel filed its answer to first amended complaint and amended counterclaims.  (July 15 SOF ¶ 18).  Marvel's counterclaims seek the following relief:

- a declaration that (1) Marvel is not obligated to pay plaintiffs pursuant to the Agreement once the Kimble patent expires (*see* Doc. No. 33, first counterclaim) and (2) the "3% of 'net product sales'" language in the Agreement refers to sales of products by Marvel alone and does not include any sales of products by third parties such as Hasbro (*id.*); and

---

[7] Marvel does not believe that it owes any additional royalties because it no longer sells Web Blaster products, but in the spirit of equity and good faith, Marvel decided the fairest thing to do would be to voluntarily provide plaintiffs 3% of its royalty stream from Web Blaster sales made by Hasbro.  Dissatisfied with Marvel's offer, plaintiffs insist on a windfall which results from plaintiffs' receiving payments based on revenue Marvel never receives.  In other words, rather than receive 3% of Marvel's revenue from its sales of Web Blasters, it seeks 30%.  (ASOF ¶ 40).

- damages for Marvel's overpayment to plaintiffs for sales in respect of 2007 by paying a royalty based on (1) Hasbro's reported net sales rather than Marvel's net product sales (*id.*, second counterclaim), (2) the total price of products consisting of kits containing a basic Web Blaster and extra-value item(s) instead of only the portion attributable to the basic Web Blaster (*id.*, third counterclaim), and (3) the total price of products containing multi-function Web Blasters instead of on the percentage of the total price of the product attributable to the function of the basic Web Blaster (*Id.*, fourth counterclaim).

Plaintiffs have filed five motions for summary judgment requesting this Court to dismiss Marvel's counterclaims.  (ASOF ¶ 42).  The first motion, filed on June 12, 2009, seeks a determination that plaintiffs are entitled to 3% of Hasbro's net product sales.  (*Id.*).  Plaintiffs filed the second motion on June 29, 2009, seeking a determination that plaintiffs are entitled to a 3% royalty on 100% of the net product sales of multi-function toys without any allocations or deductions.  (*Id.*).  Plaintiffs filed the third motion on July 1, 2009, seeking a determination that Marvel's obligation to pay royalties pursuant to the Agreement continues after the expiration of the Kimble patent.  (*Id.*).  Plaintiffs filed the fourth motion on July 6, 2009, seeking a determination that plaintiffs are entitled to a 3% royalty on 100% of the net product sales of extra-value items.  (*Id.*).  The last motion was filed two days later on July 8, 2009, and seeks a declaration that the term "net product sales" as used in the Agreement is 93% of gross product sales.  (*Id.*).

## ARGUMENT

## II.  LEGAL STANDARDS

### A.  Standard for granting summary judgment under Rule 56

Summary judgment is only proper where no genuine issue as to any material fact exists, and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The initial burden always rests on the moving party to point out the absence of any genuine issues of material fact.  FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 323.  Once the initial burden is satisfied, the burden then shifts to the non-moving party to demonstrate through production of probative and

1  admissible evidence that an issue of fact remains to be tried.  *Celotex*, 477 U.S. at 323-24.

2  The Court must accept the non-movant's evidence as true and view all inferences in a

3  light most favorable to the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

4  252 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987).

5              **B.    Summary judgment involving contracts governed by New York law**

6              "The threshold inquiry in a motion for summary judgment involving a

7  contract dispute is whether the contract is free from ambiguity such that its provisions

8  may be enforced without resort to extrinsic evidence."  *Kaung v. Board of Managers of*

9  *Biltmore Towers Condo. Ass'n*, 22 Misc. 3d 854, 865, 873 N.Y.S.2d 421, 430 (Sup. Ct.

10  2008).[8]  "Whether an agreement is ambiguous is a question of law for the courts."  *Kass v.*

11  *Kass,* 91 N.Y.2d 554, 566, 696 N.E.2d 174, 180, 673 N.Y.S.2d 350, 356 (1998).

12              If the language is unambiguous, courts give effect to its plain meaning.  *See*

13  *Nichols v. Nichols*, 306 N.Y. 490, 496, 119 N.E.2d 351, 353 (1954).  The language is

14  unambiguous if it has "a definite and precise meaning, unattended by danger of

15  misconception in the purport of the [agreement] itself, and concerning which there is no

16  reasonable basis for a difference of opinion."  *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351,

17  355, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355 (1978).

18              If the language is ambiguous, courts may consider extrinsic evidence in

19  interpreting the agreement.  *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d

20  169, 171, 305 N.E.2d 907, 909, 350 N.Y. S.2d 895, 898 (1973); *but see Hudson-Port*

21

22  _____

23  [8] The Agreement contains a New York choice of law provision, and laws of New York
   govern the principles of contract interpretation.  (July 15 SOF ¶ 14); *see Welles v. Turner*
24  *Entm't Co.*, 503 F.3d 728, 734 (9th Cir. 2007) ("Because the [agreement] contains a New
   York choice of law provision, we apply New York's principles of contract interpretation
25  in deciding this issue.").  "The view that the parol evidence rule is substantive rather than
   procedural has received such wide spread recognition that it may be said to be universally
26  accepted."  11 Richard A. Lord, Williston on Contracts § 33:3 (4th ed. 2009) (citing
   *Vickery v. Fisher Governor Co.*, 417 F.2d 466 (9th Cir. 1969) (applying Iowa law).

27

28

1  *Ewen Assocs., L.P. v. Kuo*, 78 N.Y.2d 944, 945, 578 N.E.2d 435, 435, 573 N.Y.S.2d 637,

2  637 (1991) ("Where consideration of a contract as a whole resolves an ambiguity created

3  by *one clause*, there is no occasion to consider extrinsic evidence of the parties' intent.")

4  (emphasis added).  Only where a contract is ambiguous will extrinsic evidence be

5  considered to determine the parties' intentions.  *See Jellinick v. Joseph J. Naples &*

6  *Assocs. Inc.*, 296 A.D.2d 75, 78, 744 N.Y.S.2d 610, 613-14 (4th Dep't 2002).

7  "[I]f it is necessary to refer to extrinsic facts, which may be in conflict, to

8  determine the intent of the parties, there is a question of fact and summary judgment

9  should be denied."  *Am. Express Bank, Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562

10  N.Y.S.2d 613, 614-15 (1st Dep't 1990); *see Janos v. Peck*, 251 N.Y.S.2d 254, 261 (1st

11  Dep't 1964), *aff'd*, 15 N.Y.2d 509, 202 N.E.2d 560, 254 N.Y.S.2d 115 (1964) (stating that

12  if "the intent of the parties becomes a matter of inquiry, and the interpretation of the

13  language used by them is a mixed question of law and fact, . . .  [u]nder such

14  circumstances, summary judgment may not ordinarily be granted"); *see also Welles v.*

15  *Turner Entm't Co.*, 503 F.3d 728, 734 (9th Cir. 2007) ("The interpretation of a contract is

16  a question of law that we may decide *unless* the interpretation depends on the credibility

17  of extrinsic evidence, in which case the interpretation of the contract is the *task of the*

18  *factfinder*.") (emphasis added).

19  **III.  SINCE JANUARY 1, 2007, MARVEL HAS OWED PLAINTIFFS NO**
20  **ROYALTIES BECAUSE IT HAD ZERO NET PRODUCT SALES (PLAINTIFFS' FIRST MOTION)**

21  **A.  <u>The plain language of the Agreement indicates that the term "net</u>**
22  **<u>product sales" only includes Marvel's net product sales, not third-party</u>**
    **<u>sales.</u>**

23  In their first motion for summary judgment, plaintiffs argue that the

24  language in the Agreement[9] "is complete, clear and unambiguous on its face" and because

25

26  _____

27  [9] Paragraph 3 of the Agreement provides as follows:

28

of the "obvious intent and clear language," Marvel should be required to pay 3% of Hasbro's net product sales.[10] (See Doc. No. 47 at pp. 4-5). Plaintiffs' position is unsupported by the Agreement and fails under its own reasoning.

Nowhere in the Agreement does it say that plaintiffs are entitled to royalty payments from Hasbro's sale of Web Blasters, or from any other third-party's sale of Web Blasters because the Agreement does not define "net product sales." (SOF #5 ¶ 2). Therefore, the plain language of the Agreement must be referring to Marvel's net product sales because only Marvel and plaintiffs are parties to the Agreement.

Marvel never suggested that it was relieved of its obligations under the Agreement to pay royalties on its own net product sales as distinguished from Hasbro's net product sales. Marvel asserts only that it has no "net product sales" because it stopped manufacturing and selling the toys altogether. Any percentage on zero net product sales should be zero. Marvel does not make or sell Web Blasters anymore and should not have to pay royalties on product sales made by a third-party. (ASOF ¶ 21). Nevertheless, plaintiffs now ask this Court to obligate Marvel for 3% of anyone's "net product sales" through their first motion for summary judgment. (See Doc. No. 47). That reading of the Agreement is unwarranted.

If the Agreement were not referring to Marvel's net product sales, the result

---

Marvel agrees to purchase from the Patent Holders and the Patent Holders agree to sell to Marvel the Patent which will be evidenced by an instrument of assignment in the form of exhibit C hereto. The purchase price for the Patent shall be payable to the Patent Holder as follows:

a. $516,214.62 upon execution and delivery of this Agreement; and

b. 3% of "net product sales" (as such term is used in the Judgment) excluding refill royalties made after December 31, 2000.

(July 15 SOF ¶ 8).

[10] For purposes of this section, a precise meaning of the term "net product sales" does not need to be determined. The threshold inquiry is determining "whose" net product sales the Agreement contemplates, and this is the only inquiry analyzed in this section.

would be nonsensical.  For example, a 3% royalty payment on Hasbro's net sales of the Web Blasters would mean that Marvel must pay 30% of the revenue it receives from Hasbro.  (ASOF ¶ 40).  As a hypothetical and simplistic example, when Hasbro sells one unit of the Web Blaster for $10, Marvel receives one dollar pursuant to the HLA.  If Marvel had to pay 3% royalties on Hasbro's sales, then it would have to pay thirty cents to plaintiffs, which amounts to 30% of the one dollar Marvel receives.  Paying 30% of its revenue cannot possibly be what Marvel intended when it entered into the Agreement which provides for only a 3% payment.

Any doubt as to the scope of Marvel's royalty obligations can be resolved within the four corners of the Agreement itself without resorting to extrinsic evidence.  It is well-settled under New York law that "[w]here consideration of a contract as a whole resolves an ambiguity created by one clause, there is no occasion to consider extrinsic evidence of the parties' intent."  *Hudson-Port Ewen Assocs.*, 78 N.Y.2d at 945, 578 N.E.2d at 435, 573 N.Y.S.2d at 637 (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162-63 (1990)).  The Agreement, taken as a whole, indicates that it was intended to cover only Marvel's sale of products, not any other third-party's sales.

First, the Agreement states that Marvel is to "(i) submit to Kimble (on behalf of the Patent Holders) a report . . . covering net product sales made during such quarter which shall include the number of units sold, the price(s) at which such products were sold and a calculation of net product sales made during such quarter."  (ASOF ¶ 2). The Agreement also provides for a penalty provision for overdue payments.  (ASOF ¶ 3). If the term "net product sales" were intended to include a third-party's sales, such as those of Mattel, Marvel is unlikely to have been able to account for the number of units sold or for the prices at which such products were sold.  It is also unlikely that Marvel would have agreed to a late payment penalty provision if it had to rely on third-party information.  The fact that Marvel receives a report from Hasbro regarding such information is irrelevant. Hasbro only provides the information because it has to pay Marvel 10% royalties pursuant to the HLA and plaintiffs have provided no evidence suggesting that the HLA transferred

-11-

1    to Hasbro any rights of Marvel's under the Agreement.  (ASOF ¶ 13).

2              Further, the Agreement also states that "a certified public accountant

3    designated by Kimble . . . will have the right . . . to examine the financial records of

4    Marvel pertaining to net product sales to the extent necessary to confirm the accuracy of

5    the information."  (ASOF ¶ 4).   If the term "net product sales" were intended to include

6    any third-party's net product sales, such as Mattel's, this provision would be meaningless

7    because examining Marvel's records would not provide any information as to the net

8    product sales of a third-party.  Again, the fact that Marvel receives a report from Hasbro

9    regarding such information is irrelevant because the HLA, putting Hasbro in the same

10   position as an unrelated third-party such as Mattel would be if they started to make Web

11   Blaster products without licensing Marvel's copyrights and trademarks.

12             Every provision of the Agreement indicates that the term "net product sales"

13   refers to Marvel's net product sales.  Accordingly, plaintiffs' non-patent motions should

14   be denied.

15             **B.      The HLA is irrelevant to interpreting the Agreement.**

16

17             Marvel and Hasbro are two independent companies that separately record

18   their own sales and profits.  (ASOF ¶ 12).  The two companies have a business

19   relationship through the HLA.  (RSOF #4 ¶ 8).  The HLA license agreements states only

20   that Hasbro has obtained the copyright and trademark rights to use Marvel's characters

21   (including Spider-Man) in marketing its toys.  (ASOF ¶ 14).  Marvel "reserve[d] all rights

22   not specifically granted to [Hasbro]."  (ASOF ¶ 17).

23             It is well-established that copyright and trademark rights are "separate and

24   distinct" from functional features of a product.  See *In re Mogen David Wine Corp.*, 328

25   F.2d 925, 929 (C.C.P.A. 1964) (holding that trademark rights "exist independently of [the

26   technology], under different law and for different reasons"); *Pachmayr Gun Works, Inc. v.*

27   *Olin Mathieson Chem. Corp., Winchester W. Div.*, 502 F.2d 802, 807 (9th Cir. 1974)

28   ("[T]he law is settled that an essentially functional feature of a product cannot be the

-12-

subject of a valid trademark.") (citing *In re Mogen David Wine*, 328 F.2d 925); *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304 (2d Cir. 1972) (stating that "trademark protection is separate from that afforded by a design patent") (citing *In re Mogen David Wine*, 328 F.2d at 930); *Taylor Instruments Cos. v. Fawley-Brost Co.*, 139 F.2d 98, 99 (7th Cir. 1943) (explaining that functional rights are "separate and distinct" from copyright protections).

The Agreement only provides Marvel with certain rights relating to the functional features of its subject foam string shooting toy.  (July 15 SOF ¶ 1).  Plaintiffs do not hold and have never asserted any copyright or trademark rights to Marvel's characters.  (ASOF ¶ 16)  Plaintiffs' functional rights under the Agreement were not "specifically granted to" Hasbro and stayed with Marvel.  (ASOF ¶ 17).  In fact, Marvel specifically offered to sublicense its rights under the Agreement to Hasbro at a later time, but Hasbro rejected the offer because it did not need the rights.  (ASOF ¶ 18).  Therefore, Hasbro is merely an unrelated third-party with respect to the rights under the Agreement.

Indeed, plaintiff has testified that if a third-party such as Mattel Inc. ("Mattel") were to independently come out with a toy that infringed the Kimble patent, Marvel would not be obligated to pay plaintiffs a royalty on Mattel's sale of that product. (ASOF ¶ 20).  Plaintiffs have provided no valid basis as to why Hasbro's sales should be treated any differently than if Mattel were selling Web Blasters.  With respect to the Agreement, Hasbro is merely an unrelated third-party and nothing in the HLA changes that.  The plain language of the Agreement gives plaintiffs the right to be paid 3% of Marvel's net product sales and makes no mention of any third-party's sales.  (July 15 SOF ¶ 8).  Marvel does not sell Web Blasters anymore and thus has zero "net product sales." (ASOF ¶ 21).  The parties could have addressed what would happen if Marvel licensed a third-party to make Spider-Man toys but they did not do so.  This Court should not rewrite the Agreement to obligate Marvel to pay royalties for net product sales made by an unrelated third-party.  (ASOF ¶ 19).

1

**C.**     **The plain language of the Agreement precludes any inquiry on summary judgment as to whether "net product sales" includes sales for multi-function and extra-value items and whether it should be interpreted as 93% of gross product sales.[11]**

2

3

4      The plain language of the Agreement limits "net product sales" to Marvel's

5 net product sales, and because Marvel is not manufacturing any Web Blasters, let alone

6 Ultimate Web Blasters or any of the extra-value items, the Court need not determine

7 whether royalties under the Agreement are payable on functions other than shooting foam

8 string or extra-value items. (July 15 SOF ¶ 8; ASOF ¶ 21). Nor does the Court need to

9 determine whether "net product sales" should be interpreted as 93% of gross product

10 sales. (*See* Doc. No. 51).

11      In their second, fourth and fifth motions for summary judgment,[12] plaintiffs

12 attempt to draw this Court's attention to Marvel's course of performance from 2001 to

13 2006. (*See* Doc. Nos. 48, 50, and 51). Plaintiffs urge this Court to view Marvel's course

14 of performance in paying royalties as indicative of the parties' intent in interpreting the

15 term "net product sales." Plaintiffs, however, cannot introduce such extrinsic facts unless

16 this Court first determines that the Agreement is ambiguous, which would be contrary to

17 the plain language of the Agreement and contrary to plaintiffs argument in their first (Doc.

18 No. 47 at p. 5), second (Doc. No. 48 at p. 7), and fourth (Doc. No. 50 at p. 5) motions for

19 summary judgment that the Agreement "is complete, clear and unambiguous on its face."

20 *See Jellinick*, 296 A.D.2d at 77, 744 N.Y.S.2d at 613-14 (only where a contract is

21 ambiguous will extrinsic evidence be presented to determine the parties' intentions).

22 _____

23 [11] This section assumes that Plaintiffs have not accepted Marvel's equitable offer that would have paid Plaintiffs 3% of the royalties that Marvel receives from Hasbro for sales of the Web Blasters.

24

25 [12] The second summary judgment motion involves the issue of whether the sales of Ultimate Web Blasters (a multi-function toy) should be included within the meaning of "net product sales." (ASOF ¶ 42). The fourth summary judgment motion deals with

26 whether the sales from Extra-Value Items should be included within the meaning of "net product sales." (*Id.*). The fifth motion seeks this Court's declaration that "net product

27 sales" should be defined as 93% of gross product sales. (*Id.*).

28

**IV.    IF THIS COURT DETERMINES THAT THE TERM "NET PRODUCT SALES" IS AMBIGUOUS, PLAINTIFFS' NON-PATENT SUMMARY JUDGMENT MOTIONS MUST BE DENIED**

After insisting that the Agreement is unambiguous and clear, Plaintiffs change course beginning in their second motion for summary judgment, by directing this Court's attention to Marvel's alleged course of performance.  (*See* Doc. No. 48, 50, 51). Although it may seem like plaintiffs are using course of performance as a backup position to their plain language argument, in reality, it is a ploy to introduce extrinsic evidence without conceding ambiguity.  Effectively, plaintiffs seek to take advantage of strategic positions that are mutually exclusive: (1) that the term "net product sales" is "complete, clear and unambiguous on its face"; and (2) that Marvel's alleged course of performance can be indicative of the parties' intent and aids this Court in interpreting "net product sales."  Extrinsic evidence of intent, however, should not even be considered if an agreement is unambiguous.  *See Jellinick, supra.*  On the other hand, if intent were to become relevant, each of plaintiffs' non-patent motions should be denied because they raise disputed issues of material fact.

    A.    <u>Plaintiffs' non-patent motions for summary judgment regarding the phrase "net product sales" must be denied if the term "net product sales" is found to be ambiguous.</u>

If a potential ambiguity cannot be resolved from the four corners of the Agreement, then the parties' intention may be determined by reference to extrinsic evidence.  Resort to such evidence necessarily implicates disputed issues of material fact that cannot be resolved in the context of summary judgment.  Among the disputed issues raised by plaintiffs non-patent motions are whether the parties intended the term "net product sales" (1) to mean anyone's net product sales; (2) to include the full reported net sales of the multi-function toys; (3) to include the full reported net sales of extra-value items without any allocations or deductions; and (4) to mean 93% of gross product sales as plaintiffs have contended.  (See Doc. Nos. 47, 48, 50, and 51).  Further, there also remains a factual issue as to whether Marvel's one-time royalty payment on the sale of

-15-

1 Ultimate Web Blasters without the multi-function allocation was intended to be an accord

2 and satisfaction.  (See Doc. No. 48 at pp. 8-9).

3 **B.**     **Reliance on a party's course of performance to interpret an ambiguous term in the Agreement necessitates a factual inquiry**

4

5          If this Court were to determine that the term "net product sales" is

6 ambiguous and refers to extrinsic evidence (e.g., Marvel's course of performance) to

7 interpret the parties' intent, the inquiry necessarily implicates issues of fact precluding

8 summary judgment.  *See Am. Express Bank, Ltd.*, 164 A.D.2d at 277, 562 N.Y.S.2d at

9 614; *Janos*, 251 N.Y.S.2d at 261 (stating that if "the intent of the parties becomes a matter

10 of inquiry, and the interpretation of the language used by them is a mixed question of law

11 and fact, . . .  [u]nder such circumstances, summary judgment may not ordinarily be

12 granted") (citation omitted); *see also Welles*, 503 F.3d at 734 ("The interpretation of a

13 contract is a question of law that we may decide *unless* the interpretation depends on the

14 credibility of extrinsic evidence, in which case the interpretation of the contract is the *task*

15 *of the factfinder*.") (emphasis added) (citation omitted).

16          A significant aspect of the factual inquiry is whether the performance even

17 amounts to a course of performance that a court may use in interpreting an ambiguous

18 term.  *See Jones v. Am. Law Book Co.*, 125 A.D. 519, 521-22, 109 N.Y.S. 706, 710 (1st

19 Dep't 1908) (the rule of practical interpretation does not apply where the acts of the

20 parties do not suggest a practical construction of the contract).  For example, one of the

21 parties may misinterpret the contract or may mistakenly perform more than the contract

22 required.  *See Brainard v. New York C. R. Co.*, 242 N.Y. 125, 133, 151 N.E. 152, 154

23 (1926) (a payment "through inadvertence or by reason of failure properly to construe the

24 language" not held conclusive against the performing party).  Moreover, the duration of

25 the performance may not be sufficient for it to constitute "considerable period of time" as

26 mandated by the Supreme Court.  *See Old Colony Trust Co. v. City of Omaha,* 230 U.S.

27 100, 118 (1913) ("[T]he practical interpretation of a contract by the parties to it for any

28 *considerable* period of time before it comes to be the subject of controversy is deemed of

-16-

great, if not controlling, influence.") (emphasis added).

In their second, fourth and fifth motions for summary judgment, plaintiffs primarily argue that Marvel has been (1) "selling multi-function toys and has consistently and without exception paid plaintiffs full royalties for those multi-function toys"; (2) "selling the Web Blaster with additional items and has consistently paid plaintiffs royalties without allocating between the Web Blaster and the other items"; and (3) paying 3% royalties on "93% of gross product sales." (*See* Doc. Nos. 48 at p. 8, 50 at p. 6, and 51 at p. 4). Not only are each of these material facts disputed, but plaintiffs characterization of many of these allegations are patently false. Furthermore, even where Marvel does not dispute that it performed certain tasks, issues of material fact still exist as to whether certain of Marvel's past payments amount to a course of performance that this Court may use in interpreting an ambiguous term.

For example, Marvel made quarterly royalty payments from 2001 to 2006 based on 93% of invoiced sales which included the sales for extra-value items without any allocations. (ASOF ¶¶ 9-11). However, this was an oversight on Marvel's part. (ASOF ¶ 11). Admittedly, Marvel should have been more careful with its payments, but these types of mistakes happen. Should the Court accept plaintiffs' invitation to find the Agreement ambiguous and open the door to extrinsic evidence, Marvel submits that this Court must inquire whether Marvel's inadvertence amounts to a course of performance that the Court may use in interpreting an ambiguous term. Such an inquiry precludes summary judgment.

## C. **Disputed issues of material fact preclude the grant of summary judgment to plaintiffs.**

Not only does plaintiffs' reliance on Marvel's course of performance trigger a factual inquiry, there exist numerous disputed issues of material fact as to the meaning of the term "net product sales" if the Court were to construe this term to include Hasbro's sales.

1

**1.    Disputed issues of material fact preclude granting plaintiffs' first motion for summary judgment.**

2

3      In their first motion for summary judgment, plaintiffs distort Marvel's

4   position and attempt to conceal the limitations of their argument with baseless assertions.

5   Plaintiffs assert that "Marvel now argues that it should not be obligated to pay 3% of

6   Hasbro's net product sales, but instead, 3% of Marvel's profit on those sales." (See Doc.

7   No. 47 at p. 4). Nothing in the record suggests that Marvel is making such an argument.

8      Marvel voluntarily credited plaintiffs with 3% of the royalty stream it

9   receives from Hasbro for using Marvel's copyrights and trademarks in conjunction with

10   Web Blasters. (ASOF ¶ 41). This is in no way an admission that plaintiffs are entitled to

11   any royalties from Hasbro's sales. Marvel merely recognized that Hasbro's sale of Web

12   Blasters creates revenue for Marvel in the form of license royalties and that voluntarily

13   providing plaintiff to share in that revenue stream would be consistent with the spirit of

14   good faith and equity. Plaintiffs distort Marvel's equitable gesture as a ploy to redefine

15   "net product sales" as "net profits."[13]  (See Doc. No. 47 at p. 4).

16      As discussed in more detail *supra*, a 3% royalty payment on Hasbro's net

17   sales of the Web Blasters would mean that Marvel must pay 30% of the revenue it

18   receives from Hasbro. (ASOF ¶ 40)   Paying 30% of its revenue cannot possibly be what

19   Marvel intended when it entered into the Agreement which provides for only a 3%

20   payment. In fact, Mr. Kimble himself admitted that such interpretation would not be what

21   parties had intended by stating that "[w]ell, I don't know that anybody contemplated [the

22   30% effective royalty rate] when the agreement was made . . . ." (ASOF ¶ 40).

23

24

25

---

26   [13] The royalties Marvel receives from Hasbro cannot be considered as net profits for
Marvel because Marvel has incurred and continues to incur significant costs in order to

27   generate its license revenue from Hasbro.

28

1

2

## 2.    Issues of disputed material fact preclude granting plaintiffs' second motion for summary judgment.

3    In their second motion for summary judgment, plaintiffs argue that "net

4  product sales" should include the reported net sales of multi-function Ultimate Web

5  Blasters as a whole without any functional allocations or deductions.  (See Doc. No. 48).

6  In doing so, plaintiffs allege that "[s]ince [the Agreement's] inception almost eight years

7  ago, Marvel has been selling multi-function toys and has consistently and without

8  exception paid plaintiffs full royalties for those multi-function toys."  (*Id.* at p. 8).

9  Plaintiffs are demonstrably wrong.  Marvel has never argued that any Web Blasters sold

10  by Marvel feature multiple functions, and Marvel has never attempted to make a multi-

11  function allocation to any Web Blaster other than Ultimate Web Blasters – which have

12  only been made and sold by Hasbro since 2007. (RSOF #2 ¶ 2).  In fact, Marvel

13  specifically told plaintiffs "we have never before applied less than 100% credit toward

14  any sold product with your patent rights – but chose to currently for this one SKU [the

15  Ultimate Web Blaster], only, because of the reasons noted in my last email – namely, this

16  product is being marketed for the multi-functions it presents."  (*Id.*).  Accordingly, the

17  Ultimate Web Blaster is the first toy that warrants a multi-function allocation, and it was

18  not sold by Hasbro until 2007.  (ASOF ¶¶ 21-23).

19    The Ultimate Web Blaster is the only toy in which multiple functions have

20  been incorporated within a single unit.  It allows the user to "rotate" through five lock-

21  and-load compartments consisting of web fluid, spraying water, a foam suction dart,

22  missiles, and stretchy webs.  (*Id.*).  All prior toys that plaintiffs characterize as multi-

23  function toys have been items where the user could only use one function at a time by

24  replacing the entire foam string canister.  (ASOF ¶ 24).  In other words, such toys include

25  extra-value items that were sold together with the Web Blasters.  Accordingly, plaintiffs'

26  allegation that Marvel has sold and paid royalties on multi-function toys for six years is

27  false and without merit.  At a minimum, this is a disputed material fact as to whether there

28  is a course of performance warranting denial of plaintiffs' second motion for summary

1   judgment.

2          Plaintiffs also attempt to invoke the doctrine of accord and satisfaction

3   based upon Marvel's one-time royalty payment on the Ultimate Web Blaster on January

4   28, 2008.  (See Doc. No. 48 at pp. 8-9)  Marvel initially paid a 3% royalty on 20% of

5   Hasbro's reported net sales of the Ultimate Web Blaster on December 21, 2007.  (ASOF ¶

6   28).  Marvel made the 20% allocation because, as stated above, the Ultimate Web Blaster

7   has five distinct functions, only one of which arguably involves rights Marvel obtained

8   under the Agreement.  (ASOF ¶ 23).  Marvel explained that each function of the Ultimate

9   Web Blaster is equally important and that plaintiffs were not entitled to benefit from

10  Marvel and Hasbro's efforts in researching and developing the other four functions and

11  the Agreement does not provide otherwise.  (ASOF ¶ 31).  There are significant

12  differences between the multi-function Ultimate Web Blaster and the "Spider-Man Web

13  Blaster, Item 47630" that was litigated in the prior case and the Ultimate Web Blaster,

14  with the only common elements being the Spider-Man branding and the shooting of foam

15  string.  (*Id.*)  It is also the other four functions of the Ultimate Web Blaster that "kee[p]

16  the product fresh to the consumers" as it is believed that a product featuring merely the

17  same toy previously litigated would not have survived.  (ASOF ¶ 30).

18          On January 7, 2008, plaintiffs objected to the 20% allocation via email.

19  (ASOF ¶ 29).  After exchanging a series of emails that set forth the parties' positions,

20  Marvel made the additional royalty payment that would have been a full 3% of Hasbro's

21  reported net sales of the Ultimate Web Blaster once added to Marvel's initial payment on

22  December 21, 2007.  (ASOF ¶ 32).  This supplementary payment was made on January

23  28, 2008.  (*Id.*).  However, such a payment did not result from parties' settlement, and

24  certainly was not a result of "weeks of negotiations" as plaintiffs assert.  (*See* Doc. No. 48

25  at p. 8).  There simply is no evidence in the record suggesting that Marvel received or

26  even discussed any potential consideration at the time this "negotiation" took place as

27  would be required for accord and satisfaction.

28          In fact, plaintiffs cannot even make up their mind what consideration was

-20-

1   provided by plaintiffs for the alleged accord and satisfaction.  For example, Kimble

2   testified that "the consideration for Mr. West's agreement or alleged agreement to give up

3   the issue of allocations was [his] forbearance for suing."  (ASOF ¶ 33).  However, in their

4   second motion for summary judgment, plaintiffs now take the position that the

5   consideration was giving up their a claim for late payment interest.  (See Doc. No. 48 at p.

6   8).[14]

7        Both of plaintiffs' alleged considerations are nonsensical.  Plaintiffs cannot

8   have given up their right to sue as they brought this action within a few months of the

9   alleged forbearance.  Furthermore, to this day, plaintiffs have not given up their right to

10  collect interest under the Agreement and took the position that they are entitled to interest

11  as recently as May 1, 2009 stating "we are owed interest both on these figures as well as

12  interest for the delay in making payment to us for the unreported and late reported items."

13  (ASOF ¶ 33).

14       Moreover, Kimble's deposition testimony was the first time any

15  consideration was even mentioned.  (ASOF ¶ 33).  The testimony was given on April 23,

16  2009, long after this lawsuit had been initiated.  The first time that plaintiffs ever asserted

17  the accord and satisfaction defense was on May 18, 2009, in its first amended answer to

18  amended counterclaims.  (Id.).  If any actual consideration for a "settlement" had been

19  discussed and there was the requisite meeting of the minds to form a new contract,

20  plaintiffs would not have waited nearly a year to set forth their accord and satisfaction

21  defense.[15]

22  _____

23  [14] Giving up any owed interest could not have been valid consideration to form a new
    agreement as required for an accord and satisfaction because Ken West testified as of

24  April 7, 2009 that he did not know if under the Agreement, Marvel is obligated to pay
    interest for monies that are not paid timely.  (ASOF ¶ 32).

25  [15] Aside from the factual inaccuracy, even the very case that plaintiffs cite for their
    proposition indicates that Marvel's payment was not an accord and satisfaction as a matter

26  of law.  See Patel v. Orma, 190 A.D.2d 782, 783, 593 N.Y.S.2d 851, 853 (2d Dep't 1993)
    (rejecting the accord and satisfaction defense because there must be "a new contract

27  discharging all or part of their obligations under the original contract").  First, a new

28

1    All the parties did with respect to the allocation issue was exchange a few

2    emails before Marvel decided to make payment for the reporting period in question in

3    good faith for the time being. (*See* Doc. No. 48-7 at pp. 1-16; ASOF ¶ 32). Further,

4    contrary to plaintiffs' allegations, one payment limited to the sales of Ultimate Web

5    Blasters for one reporting period does not constitute an "ultimate resolution of the issue."

6    (*See* Doc. No. 48 at p. 8). This one-time payment with no evidence to suggest that either

7    of the parties thought a new contract was formed cannot amount to an accord and

8    satisfaction.

9    **3.    Disputed issues of material fact preclude granting plaintiffs'**
          **fourth motion for summary judgment.**

10

11    In their fourth motion for summary judgment, plaintiffs argue that "net

12    product sales" should include the reported net sales of Web Blasters sold with extra-value

13    items without making any deductions for the extra-value items. Plaintiffs are essentially

14    making the same arguments for this motion as in their second motion. As with plaintiffs

15    second motion, there are disputed issues of material fact whether Marvel's past payments

16    amount to a course of performance.

17    Furthermore, if the Court considers extrinsic evidence, this motion requires

18    resolving the additional fact as to whether Marvel is obligated to pay royalties on extra-

19    value items which Hasbro, not Marvel chooses to package with Web Blasters. (ASOF ¶

20    22). Contrary to plaintiffs' assertions (Doc. No. 50 at p. 6), Marvel is no longer the

21    decision maker with respect to what toys are sold. (*Id.*) Hasbro now chooses what toys to

22

23    contract could not have been formed because there was no consideration. Further, Marvel
      and plaintiffs did not enter into a new contract that discharged any obligations under the
24    original contract. Even assuming that the original Agreement contemplated that Marvel
      pay 3% of net sales of Ultimate Web Blaster without a multi-function allocation, because
25    Marvel paid the full amount, there simply was no discharge of Marvel's potential prior
      obligations as required for there to be an accord and satisfaction. In sum, plaintiffs'
26    reliance on accord and satisfaction doctrine is a careless and disingenuous attempt to
      mislead this Court.
27

28

-22-

1   make and sell and makes the final decision on how the toys are packaged.  (*Id.*)  As with

2   plaintiffs' second motion, plaintiffs' fourth motion presents disputed issues of material

3   fact as to whether the Agreement contemplates Marvel paying royalties on any item

4   Hasbro may choose to package with a Web Blaster, even if Marvel does not receive

5   royalty payments for that item.

6          **4.      Issues of disputed material fact preclude granting plaintiffs' fifth
                      motion for summary judgment.**
7

8          In their fifth motion for summary judgment, plaintiffs once again make

9   factual allegations that are disputed and unsupported by the record.  For example,

10  plaintiffs state that "[i]n the negotiations, Marvel intended to have Hasbro execute a Toy

11  Technology Sublicense Agreement (T.T.S.A.) that would have obligated Hasbro to

12  assume Marvel's financial obligations to plaintiffs under the Agreement."  (See Doc. No.

13  51 at p. 3).  Marvel did not intend to have Hasbro execute a T.T.S.A. during its license

14  negotiations with Hasbro.  In fact, the record indicates that the first time Marvel

15  mentioned the T.T.S.A. to Hasbro was in August 2006, seven months after the HLA was

16  executed on January 6, 2006.  (RSOF #4 ¶ 11).  Josh Silverman, Marvel's vice president

17  and assistant general counsel, testified that he "can't recall" whether he was even aware of

18  Marvel's obligations under the Agreement at the time he negotiated the HLA.  (*Id.*).

19         Hasbro rejected the offer because it did not need the technology and the

20  musical rights to continue selling toys that featured Marvel's characters.  (ASOF ¶ 18).

21  Moreover, plaintiffs can scarcely speak to what Marvel's intentions were in its

22  negotiations with Hasbro because they were not present at or involved in those

23  negotiations and have presented no evidence of Marvel's intent.  (ASOF ¶ 15).

24         Plaintiffs also assert that David Fremed ("Fremed"), former chief financial

25  officer of the Toy Biz division of Marvel, testified that "net product sales" was defined as

26  93% of gross product sales.  (See Doc. No. 51).  This assertion is false.  David Fremed

27  testified that "net sales" has often been interpreted as 93% of "invoiced sales" at a time

28  when Marvel was still making toys.  (RSOF #5 ¶ 3).  Although it may seem like a

                                        -23-

1   technicality, "net sales" and "net product sales" may be completely different terms

2   depending on a particular agreement, which would require this Court's inquiry.  Marvel

3   paid royalties on 93% of the "invoiced sales" when it sold toys, but this does not establish

4   that 93% of the "invoiced sales" is the definition of "net product sales" as an undisputed

5   fact.  (*Id.*).  This is especially true when there is a dispute as to whether sales of Ultimate

6   Web Blasters and extra-value items should be included in the "invoiced sales" without

7   any allocations or deductions.

8          Moreover, Fremed's testimony was given in 2000 when Marvel was still

9   making toys.  (*Id.*).  Now that Hasbro makes and sells Web Blasters, Fremed's testimony

10  is no longer relevant.  Marvel's traditional 7% for "P&L allowance" may have been

11  appropriate for Marvel when it sold toys, but it is obviously not an appropriate amount for

12  returns and allowances for Hasbro, which is now in full control.  (ASOF ¶ 22).  In fact,

13  plaintiffs have alleged that Hasbro pays royalties on only 87.2% of the invoiced sales of

14  Web Blasters.  (ASOF ¶ 10).

15

16                              **CONCLUSION**

17

18         For the foregoing reasons, plaintiffs' first, second, fourth, and fifth motions

    for summary judgment should in all respects be denied.

19

20  DATED this 10th day of August, 2009.

21

22                              PAUL, HASTINGS, JANOFSKY
                                & WALKER LLP

23

24                              By:  /s/ David Fleischer
                                        David Fleischer

25                              SNELL & WILMER L.L.P,
                                Andrew Jacobs

26                              Joseph A. Kroeger

27                              Attorneys for Defendant

28

                                    -24-

1

## **CERTIFICATE OF SERVICE**

2

3       I hereby certify that on August 10, 2009, I electronically transmitted the attached

4

document to the Clerk's Office using the ECF System for filing and transmittal of a

5

Notice of Electronic Filing to the following ECF registrant:

6

7

8           Robert Grabb
            rgrabb@aol.com
9           KimbleGrabb P.L.L.C.
            7411 E. Tanque Verde Rd.
10          Tucson, Arizona 85715
            (520) 326-2500
11

12

13
                                        /s/ David Fleischer
14                                      David Fleischer
15

16

17

18

19

20

21
LEGAL_US_E # 84605251.6 42256.00075
22

23

24

25

26

27

28