**KimbleGrabb, P.L.L.C.**
7411 E. Tanque Verde Rd.
Tucson, Arizona  85715
Ph: 520.326.2500
kimblelaw@aol.com

Attorneys / Plaintiffs / Counter Defendants

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| STEPHEN KIMBLE, an individual, and ROBERT GRABB, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>MARVEL ENTERPRISES, INC.,<br><br>Defendant. | Case No. CIV 08-372-TUC-DCB (DTF)<br><br>**REPLY TO DEFENDANT'S CONSOLIDATED OPPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT**<br><br>(ORAL ARGUMENT REQUESTED) |

## Introduction

The Agreement at issue is clear and unambiguous.  Marvel can make and sell the Web Blaster and, in exchange, it pays plaintiffs 3% of net product sales.  For almost seven years the parties have understood this Agreement and abided by it.  In 2007, a series of events took place that caused Marvel to unilaterally change its performance under the Agreement.

It entered into an agreement with Hasbro that allowed Hasbro to make and sell the Web Blaster.  After unsuccessful attempts to have Hasbro assume Marvel's obligations to plaintiffs, Marvel began a campaign to reduce those payments.  For the

first time ever, it imposed deductions for multi-functions.   For the first time ever, it imposed deductions for added items. For the first time ever, it reduced net product sales from 93% of gross sales to 87.2% of gross sales.  When plaintiffs audited Marvel and then filed suit, Marvel retaliated by reducing the payments further, from 3% of Hasbro's net product sales, to 3% of Marvel's profit.  It then changed positions again and reduced the payments from 3% of Marvel's profits to zero.  It then went even further, demanding reimbursement of more than 1 million dollars.  This suit seeks to stop that.

Despite Marvel's Herculean attempts to manufacture a genuine question of material facts, none exist.  In an effort to confuse the facts and muddy the issues, defendant chose to answer all of plaintiffs' non-patent *Motions for Summary Judgment* at once, jumbled together in a single document.  This allowed defendant to file a long, verbose and confusing *Opposition*.  Plaintiffs' *Reply* breaks out the individual motions and addresses each specifically.   In the final analysis it is clear that plaintiffs are entitled to the relief sought in each of their *Motions for Summary Judgment.*

**Standard for Summary Judgment**

There is no dispute as to the legal standard that applies to a motion for summary judgment.  To succeed, the movant is required to establish that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.  By doing so, the movant then shifts the burden to the nonmovant to show that a material question exists requiring a trial. *Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320 at 324, 508 N.Y.S.2d 923, 501 N.E.2d 572 (1986).

It is plaintiffs' position that there are no genuine issues of fact. The terms of the Agreement are clear and unambiguous. Whether a contract is ambiguous is a question of law. *Kass v. Kass*, 91 N.Y.2d 556, 696 N.E.2d 174 (1998). If the court determines that the agreement is not ambiguous, then it simply gives effect to the agreement's plain meaning. *Nichols v. Nichols*, 306 N.Y.490, 119 N.E.2d 353 (1954).

If after reviewing the language of the agreement there exists a question of interpretation, the court is to examine the available extrinsic evidence. Such evidence includes the parties' prior course of performance. In fact, the parties' prior course of performance is "the most persuasive evidence of the agreed intention of the parties." (*Fed. Ins. Co. v. Ams. Ins. Co.*, 691 N.Y.S. 2d 508, 258 A.D.2d 39 (1999); *Hartford Accident & Indem. Co. v. Sesolowski*, 33 N.Y.2d 169, 305 N.E.2d 907(1973). If the extrinsic evidence is not in dispute, then again, summary judgment is appropriate.

Plaintiffs have submitted voluminous documents showing the parties' course of performance from the inception of the Agreement in 2001. The Court has before it the Agreement itself, affidavits regarding the parties' prior course of performance, financial records, emails, and deposition testimony. Individually and collectively they establish that Marvel is obligated to pay plaintiffs 3% of net product sales of the Web Blaster without deduction for added items or multiple functions. There are no disputed questions of fact and the burden now shifts to Marvel to raise a question of fact that would require a trial.

Since the parties' course of performance under the Agreement is so damaging to Marvel, it argues that the very act of examining the history precludes summary

judgment.  Marvel is incorrect.  If, as here, the history is undisputed, then no question is raised and summary judgment is appropriate.

Marvel attempts to minimize the importance of the parties' course of performance by arguing that "the duration of the performance may not be sufficient for it to constitute a 'considerable period of time' as mandated by the Supreme Court." (Doc. 59, pg. 20)  While the legal principal is correct, its application here is frivolous.

Of course the parties' course of performance must be of sufficient duration to constitute a "considerable period of time," but in this case there can be no question that it was.  In fact, defendant doesn't even argue that it was not.  The parties entered into a contract in 2001.  A dispute arose in 2008.  The course of performance submitted to the court for examination is for the entire duration of the Agreement. Certainly seven years of performance over the seven years the Agreement was in effect before the dispute arose constitutes a considerable period of time.

Marvel repeatedly argues that there are disputed questions of material fact, but simply saying that there are questions of fact is insufficient.  Marvel must explain what those facts are and how they defeat plaintiffs' *Motions for Summary Judgment.*  In *Ehrlich v. Amer. Moninger Greenhouse*, 26 N.Y.2d 255, 309 N.Y.S.2d 341, 257 N.E.2d 890 (1970), the New York Court of Appeals affirmed the granting of a motion for summary judgment, stating:

> It was essential for the defendants […] to state their version of the facts in evidentiary form. "Bald conclusory assertions, even if believable, are not enough." (citations omitted)
>  A review of the record before us discloses that the allegations of the defendants fail to adequately raise a triable issue. Every piece of documentary evidence — the note, the entry in plaintiff's checkbook, and the books of account and financial statements of the defendant corporation — conclusively indicate that this transaction was a loan.

> Moreover, the explanation of defendants, that the transaction was made to appear as a loan for "tax reasons", is not sufficient to overcome the overwhelming documentary evidence offered by the plaintiff. Just what these "tax reasons" were and how disguising the transaction as a loan would have benefited any of the parties involved is not disclosed. Such would at least be needed to prevent summary judgment for the plaintiff.
> 26 N.Y.2d at 259.

Just as in *Ehrlich*, all the documentary evidence presented by plaintiffs conclusively indicates that they are entitled to summary judgment.  The undisputed evidence proves a long and uninterrupted course of performance between the parties from 2001 through 2007 that precludes defendant from now implementing deductions for multi-functions or added items.  The evidence proves that from 2001 through 2007, "net product sales" has always meant 93% of gross product sales.  The evidence proves that plaintiffs are entitled to the agreed upon royalty even though Marvel has licensed Hasbro to manufacture and sell the toys at issue.

Marvel has offered nothing in the way of any evidence other than bald conclusory assertions that, as the court stated in *Ehrlich*, *supra*, are not enough to defeat a motion for summary judgment even if believed.   With these preliminary matters in mind, we now turn to the specifics of Marvel's *Opposition to Plaintiffs' Motions for Summary Judgment.*

### I.  Plaintiffs First Motion For Summary Judgment: Regarding Defendant's Second Counterclaim

Plaintiffs' first *Motion for Summary Judgment* addresses Marvel's second counterclaim that once it licensed Hasbro to make the Web Blaster, it no longer owes plaintiffs any royalties.

The Agreement at issue gives Marvel the right to manufacture and sell the Web Blaster.  In exchange Marvel is required to pay a 3% royalty on the "net product sales" of those toys. (Doc. #47 Exhibit 1)  Paragraph 11 of the Agreement provides that it is binding upon, and inures to the benefit of the parties and their respective heirs, administrators, executors, successors and assigns. (Doc. #47 Exhibit 1)   In 2006 Marvel licensed its rights under the Agreement to Hasbro, Inc. and Hasbro now makes the Web Blaster. (Doc. #50 Exhibit 5)

In its *Opposition*, Marvel argues that "Since January 1, 2007, Marvel has owed plaintiffs **no** royalties because it had zero net product sales." (Doc. #59, pg. 13)  Bear in mind that the Web Blaster is still being sold and Marvel is still reaping profits from its sale.  (Marvel receives 10% of the net sales of certain toys including the Web Blaster with a guarantee of at least $210 million dollars.)  (Doc. #50 Exhibit 5)

This is the latest in a host of positions Marvel has adopted.  In 2007 Hasbro began manufacturing and selling the Web Blaster.  It reported its product sales to Marvel and Marvel in turn paid plaintiffs 3% of Hasbro's net product sales. No deduction was made for multi-functions and no deduction was made for added items. (SOF #6, Reply to Defendant's Response to Plaintiff's July 8, 2009 Statement of Facts)   Marvel correctly understood that it owed plaintiffs a 3% royalty on Hasbro's sales.

Marvel subsequently divorced itself from that position and adopted a second. In this second position Marvel argued that, although it owed 3% on Hasbro's sales, it was entitled to deductions for multi-functions and added items.  (SOF #1, #2 and #3 to Plaintiffs' Additional Statement of Facts)  It then changed course again and argued

that plaintiffs were not entitled to 3% of Hasbro's sales, but, rather, 3% of Marvel's

profit. (SOF #4 and #5 to Plaintiffs' Additional Statement of Facts)   In its *Opposition*,

it argues a fourth position. That is, plaintiffs are entitled to zero.

Oddly, Marvel argues in its *Opposition* as follows:

> In their first motion for summary judgment, plaintiffs distort Marvel's position and attempt to conceal the limitations of their argument with baseless assertions. Plaintiffs assert that "Marvel now argues that it should not be obligated to pay 3% of Hasbro's net product sales, but instead, 3% of Marvel's profit on those sales." (See Doc. No. 47 at p. 4). Nothing in the record suggests that Marvel is making such an argument.

(Doc. #59, pg. 22)

Marvel should do a better job of reviewing the record. In April of 2009, Ken

West, Marvel's chief financial officer, was deposed and testified as to what monies

Marvel contended it was obligated to pay plaintiffs:

> Q. (By Mr. Kimble)  Is it your belief that your obligation to Kimble, now that Hasbro is making the toys, is to pay 3 percent of what Marvel makes?
> A. (By Ken West)  That's my belief.  (SOF #4 to plaintiffs' Additional Statement of Facts)

He was asked about his change in position from owing plaintiffs 3% of

Hasbro's sales to 3% of Marvel's revenue.

> Q. I understand that in 2007 and in fact, even 2008, it was your position that Kimble was entitled to monies based on the net product sales of Hasbro, correct?
> A. We made payments based upon that information.
> Q. Right. And you made payments based on that because that's what you believed?
> A. At that time.
> Q. Right. At what point did you change your mind about this too?
> A. I don't recall which month.
> Q. Do you recall what year?
> A. I don't know if it was late '08 or early '09.
> Q. It would have been after Kimble and Grabb requested an audit, right?
> A. Definitely.
> Q. It would have been after Kimble and Grabb filed a lawsuit?

A.   Yes.
Q.   And only after those two things occur do you change your mind about the interpretation of how much Kimble and Grabb are paid on the Hasbro Money?
A.   Yes.
(SOF #4 to plaintiffs' Additional Statement of Facts)

In its *Opposition* Marvel argues:

Nowhere in the Agreement does it say that plaintiffs are entitled to royalty payments from Hasbro's sale of Web Blasters, or from any other third-party's sale of Web Blasters because the Agreement does not define net product sales. Therefore, the plain language of the Agreement must be referring to Marvel's net product sales because only Marvel and plaintiffs are parties to the Agreement.

(Doc. #59, pg. 14)

Following Marvel's logic, it could acquire the rights from plaintiffs on day one and license those rights to Hasbro on day two.  Marvel would be able to collect tens of millions of dollars without ever having to pay plaintiffs a penny.  Such a scenario is ludicrous.  As demonstrated by the exchange reported above, not even Marvel's chief financial officer agrees with this position.  Marvel cannot avoid its obligation to pay royalties on a toy by licensing someone else to make the toy for them, particularly where, as here, Marvel itself collects royalties on the toy.

Marvel then launches into a litany of arguments (not facts) as to why such an interpretation would be unfair.  Marvel argues that:

1.   Requiring Marvel to pay 3% of net product sales would require it to pay 30% of its income on the Web Blaster.

2.   The Agreement requires quarterly reporting of sales figures and, since Hasbro isn't a party to the Agreement, it could not be interpreted to include Hasbro's sales.

3.  Hasbro is not an assignee of the Agreement.

None of Marvel's arguments has raised a question of fact.  Each requires only a brief response.

As to the first, the Agreement requires Marvel to pay royalties on "net product sales."  It does not limit the royalty payments to **Marvel's** net product sales.  Marvel's arrangement with its licensees is totally irrelevant to its obligations to plaintiffs.  To the extent the Court may wish to be informed, it is noted that, while Marvel now collects 10% of Hasbro's sales, that 10% is pure profit without the costs, overhead and expenses that were incurred when Marvel itself made the toys.  Marvel also failed to mention that it extended its license with Hasbro for another 5-6 years. (SOF #4 to plaintiffs' Additional Statement of Facts)  One can only conclude that Marvel found it more financially advantageous to continue the arrangement with Hasbro than to end it.

Marvel also argues that it is unfair for it to pocket only 70% of its revenue but it is perfectly fair for plaintiffs to pocket 0%. (Doc. #59, pg. 15) Under Marvel's interpretation, plaintiffs' revenues on $10 million in sales go from $300,000.00 to zero. While the consequences of Marvel's arrangement with Hasbro are not pertinent to the present dispute, this outcome is clearly not what the parties intended and in fact it is not how Marvel interpreted the contract before the present controversy arose.  On six occasions in 2007, up until this lawsuit, Marvel paid plaintiffs 3% of Hasbro's net product sales. (SOF #6 to plaintiffs' Additional Statement of Facts)  Clearly the course of performance as well as the testimony of Ken West demonstrates the intent of the parties that defendant owes plaintiffs 3% of Hasbro's net product sales.

As to the second argument, Marvel continues this absurd line of reasoning by stating that:

If the term 'net product sales' were intended to include any third-party's net product sales, such as Mattel's, this provision would be meaningless because examining Marvel's records would not provide any information as to the net product sales of a third-party.

(Doc. #59, pg. 15)

This argument ignores reality.  Because of their licensing relationship, Hasbro is required to provide to Marvel the very information Marvel is required to provide to plaintiffs. (Doc. #50 Exhibit 5)  In fact through 2007, Hasbro provided sales figures to Marvel and Marvel in turn provided those sales figures to plaintiffs.  Up until the present controversy, defendant paid plaintiffs 3% of Hasbro's net sales.  This took place for the entire year of 2007. (SOF #6 to plaintiffs' Additional Statement of Facts)

Marvel finally argues that it did not assign the rights to make the Web Blaster to Hasbro.  It argues that the Hasbro Licensing Agreement (H.L.A.) is irrelevant to interpreting the Agreement. This is correct except to the extent the H.L.A. licenses Hasbro the right to make the Web Blaster.

Marvel argues:

Marvel and Hasbro are two independent companies that separately record their own sales and profits. (ASOF ¶ 12). The two companies have a business relationship through the HLA. (RSOF #4 ¶ 8). The HLA license agreements states only that Hasbro has obtained the copyright and trademark rights to use Marvel's characters (including Spider-Man) in marketing its toys. (ASOF ¶ 14). Marvel "reserve[d] all rights not specifically granted to [Hasbro]." (ASOF ¶ 17).  Plaintiffs' functional rights under the Agreement were not "specifically granted to" Hasbro and stayed with Marvel.

(Doc. #59, pg. 16)

This argument should not even be considered by the Court.  This is the first time Marvel has taken such a position.  Marvel has never indicated in either of its Disclosure Statements, the Joint Report or in any discovery that Hasbro was not given the rights to manufacture the toys at issue. (SOF #1, #2 and #3 to plaintiffs' Additional

Statement of Facts)   More importantly, all the evidence indicates the opposite.  Ken West, CFO for Marvel, testified that Hasbro was given the right to manufacture the Web Blaster.

> Q.  (By Mr. Kimble)  Okay.  I guess there came a time then, when Hasbro – when Marvel entered into a contract with Hasbro for Hasbro to make toys for Marvel, correct?
> A.  (By Ken West)  Yes.
>      MR. FLEISCHER:  Objection.
> Q.  Are you familiar with that Hasbro contract?
> A.  Yes.
> Q.  Would you tell me in general terms what that contract provides for?
> A.  Yes.  The contract is a license agreement that grants Hasbro the right to manufacture and sell Marvel licensed branded toys, role play toys worldwide.

(SOF #9 to plaintiffs' Reply to Defendants Response to Plainitiffs' July 6, 2009 Statement of Facts)

Josh Silverman, vice president and assistant general counsel, business affairs for Marvel, testified that Hasbro was given the right to manufacture and sell the Web Blaster.

> Q.  (By Mr. Kimble)  But this agreement allowed Hasbro to make certain toys that Marvel had made in the past?
> Mr. Fleisher: Objection to form.  You mean categories of toys?
> Mr. Kimble:  Okay.
> A.  (By Mr. Silverman)  Yes. The grant provided to Hasbro the right to toy categories, some of which Toy Biz Limited manufactured previously.
> Q.  Are you familiar with the Web Blaster?
> A.  I am.
> Q.  You understand that at one point Marvel manufactured and sold the Web Blaster?
> A.  I believe Toy Biz Limited did.
> Q.  Marvel never did?
> A.  I think the license was with Toy Biz Limited.
> Q.  Okay.  So at one point Toy Biz Limited made the Web Blaster, and now you understand that Hasbro makes the Web Blaster.  Correct?
> A.  Yes.
> Q.  And Hasbro makes the Web Blaster because of the license agreement that you folks entered into with Hasbro.  Correct?
> Mr. Fleisher:  Object to form.

A. Yes.
(SOF #9 to Plaintiffs' Reply to Defendants Response to Plainitiffs' July 6, 2009

Statement of Facts)

JoAnne McLaughlin, Marvel's executive vice president of merchandising for

hard lines for defendant, testified that Marvel's agreement with Hasbro gave Hasbro

the right to manufacture the Web Blaster.

Q.  (By Mr. Kimble)  I gather there came a time – Marvel entered into an
      agreement with Hasbro whereby Hasbro would them make and sell or had a
      license to make and sell Marvel character toys, right?
A. (By Ms. McLaughlin)  Yes
(SOF #9 to plaintiffs' Reply to Defendants Response to Plainitiffs' July 6, 2009

Statement of Facts)

In fact, in footnote 3 of its *Motion to Dismiss*, defendant described Hasbro, Inc.

as its "licensee and the manufacturer and distributor of the Web Blaster."  (SOF #9 to

plaintiffs' Reply to Defendants Response to Plainitiffs' July 6, 2009 Statement of

Facts)

The H.L.A. itself states that Marvel is not allowed to manufacture the Web

Blaster.  (Document 50 Exhibit 5 paragraph f)  That right was assigned to Hasbro.

Most importantly, Hasbro IS manufacturing the Web Blaster and paying 10% of

its net sales to Marvel.  Clearly, Marvel assigned the rights to make the Web Blaster to

Hasbro.

Black's Law Dictionary (6th ed.) defines "assignment" as "The act of

transferring to another all or part of one's property, interest, or rights. A transfer or

making over to another of the whole of any property, real or personal, in possession or

in action, or of any estate or right therein. It includes transfers of all kinds of property,

including negotiable instruments.

In 4 Am. Jur. p. 229, an assignment in law is defined as "A transfer or setting over of property, or some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one's whole interest in an estate, or chattel, or other thing. It is the act by which one person transfers to another, or causes to vest in another, his right of property or interest therein."

The American Law Institute has defined an assignment of a right in its Restatement of the Law of Contracts, p. 171, § 149(1), as "[a] manifestation to another person by the owner of the right indicating his intention to transfer, without further action or manifestation of intention, the right to such other person or to a third person."

However it chooses to describe its license agreement with Hasbro, there can be no doubt that Marvel assigned its rights exclusively under the Agreement to Hasbro.  The court in *SR Intern. Business v. World Trade Cent. Properties,* 375 F. Supp.2d 238 (S.D.N.Y. 2005), finding a de facto assignment, cited language from *Greco v.Or. Mut. Fire Ins. Co.*, 191 Cal.App.2d 674, 12 Cal.Rptr. 802, 807, "courts will imply an assignment when consistent with parties' intent because "substance and not form controls."  *SR Intern* at 245.  *John W. Cowper Co., Inc. v. CDC-Troy Inc.,* 50 A.D.2d 1076 [4th Dept 1975] "It is a well-established rule that a party to a contract cannot relieve himself of his obligations by assigning the contract" (3 N.Y. Jur, Assignments, § 63; Lorio v Superior Sound, 49 A.D.2d 1008).

## II.  Plaintiffs' Second Motion for Summary Judgment: Regarding Defendant's Fourth Counterclaim (Multi-Function)

Plaintiffs' second *Motion for Summary Judgment* concerns defendant's claim that it overpaid plaintiffs for Web Blasters that had multiple functions.  In that context,

the *Motion* addresses the broader question of whether Marvel can reduce royalty payment for multi-function toys.  In their *Motion*, plaintiffs argued that the Agreement is unambiguous and contains no language authorizing a discount for toys that had multiple functions.  Plaintiffs further argued that, if the Court finds otherwise, it must look at extrinsic evidence to establish the intent of the parties, the uninterrupted course of performance being the most important evidence.  (*Fed. Ins. Co. v. Ams. Ins. Co.*, 691 N.Y.S. 2d 508, 258 A.D.2d 39 (1999); *Hartford Accident & Indem. Co. v. Sesolowski*, 33 N.Y.2d 169, 305 N.E.2d 907(1973).

The record demonstrates the intent of the parties regarding multi-function toys.  Without exception, from 2001 through 2006 Marvel made toys that had multiple functions and **never** took **any** deduction.  Marvel sold a dual action web blaster that shoots foam webs and water, a Mega Blast Web Blaster that shoots three streams of foam web and water and a triple action Web Blaster which shoots foam webs, water, darts and missiles.  (SOF 2 to Plaintiffs Reply to Defendants Response to Plaintiffs June 29, 2009 Motion for Summary Judgment)

The parties' course of performance leads to one conclusion . . . there is to be no deduction for multi-function toys.

In its *Opposition*, Marvel sets forth what it considers to be disputed issues of fact.  It crafts its own definition of "multi-function" in order to show that a multi-function toy was never made prior to Hasbro's manufacture of the Ultimate Web Blaster.   It argues:

> The Ultimate Web Blaster is the only toy in which multiple functions have been incorporated within a single unit. It allows the user to "rotate" through five lock-and-load compartments consisting of web fluid, spraying water, a foam suction dart, missiles, and stretchy webs. (*Id.*). All prior toys

that plaintiffs characterize as multifunction toys have been items where the user could only use one function at a time by replacing the entire foam string canister. (ASOF ¶ 24). In other words, such toys include extra-value items that were sold together with the Web Blasters. Accordingly, plaintiffs' allegation that Marvel has sold and paid royalties on multi-function toys for six years is false and without merit. At a minimum, this is a disputed material fact as to whether there is a course of performance warranting denial of plaintiffs' second motion for summary judgment.

(Doc. #59, pg. 16)

Not only does this argument acknowledge that Marvel made web blasters that had multiple functions, Marvel, in response to a Request for Admissions, admitted that versions of the Web Blaster toys sold between 1997 and the third quarter of 2007 had multiple features. (SOF 2 to Plaintiffs Reply to Defendants Response to Plaintiffs June 29, 2009 Motion for Summary Judgment)  However, Marvel argues now that they were single function toys with "extra-value items".

Marvel's definition of "multi-function" defies belief.  Webster's Dictionary defines "multi" as being "more than one".  By the dictionary definition, Marvel has been selling multi-function Web Blasters for six years.  (SOF #2 to Plaintiffs' Reply to Defendant's Response to Plaintiffs' June 29, 2009, Statement of Facts)

Since Marvel knows that it made multi-function toys and never before took a deduction, it needed to come up with a new definition of "multi".  In Marvel's new definition, a "multi" function toy must "rotate through five lock and-load compartments consisting of web fluid, spraying water, a foam suction dart, missiles, and stretchy webs."  (Doc. #59, pg. 23)  Further, it must not be a toy where the user has to replace the canister to use the different functions.

Though Marvel's definition of "multi" is ludicrous, even by its own definition, Marvel previously made and sold multi-function toys.  Marvel manufactured and sold

the Triple Action Web Blaster.  This toy not only shoots foam webs and water, but it also shoots darts and missiles, four of the five functions of the Ultimate Web Blaster. What is more, in the Triple Action Web Blaster, the user does not need to replace the canister to use the dart and missile functions. (SOF #2 to Plaintiffs' Reply to Defendant's Response to Plaintiffs' June 29, 2009, Statement of Facts)

With respect to Marvel's Fourth Counterclaim, Defendant argues that the evidence does not demonstrate either a settlement or an accord and satisfaction. Marvel argues:

> After exchanging a series of emails that set forth the parties' positions, Marvel made the additional royalty payment that would have been a full 3% of Hasbro's reported net sales of the Ultimate Web Blaster once added to Marvel's initial payment on December 21, 2007. (ASOF ¶ 32). This supplementary payment was made on January 28, 2008. (*Id.*). However, such a payment did not result from parties' settlement, and certainly was not a result of "weeks of negotiations" as plaintiffs assert.

(Doc. #59, pg. 24)

This argument is untenable, particularly because Marvel concedes that, after exchanging a series of emails over a period of several weeks where both parties set forth there respective positions, it finally acknowledged that plaintiffs' position was correct. (Doc. # 48, Exhibit 5 pages 14, 16)

Marvel argues that plaintiffs' forbearing the filing of a lawsuit and waiving of interest on overdue payments cannot be consideration for an accord and satisfaction because plaintiffs eventually filed a lawsuit and are now seeking interest payments. However, the present lawsuit was filed for reasons other than those in dispute at the time of the accord and satisfaction.

### III.  Plaintiffs' Third Motion for Summary Judgment: Regarding Defendant's First Counterclaim (Patent)

Plaintiffs' third *Motion for Summary Judgment* regards the payment of royalties beyond the expiration of the patent.   Defendant chose not to respond in this *Opposition* but instead is relying on its own *Motion for Summary Judgment.*   In its *Motion for Summary Judgment*, (Doc #54 page 9) and in its *Reply,* (Doc #64) Marvel argues that: "It is undisputed that on January 9, 2008, plaintiff Robert Grabb told Marvel that "[c]learly the Ultimate Web Blaster, along with other Web Blaster products currently on the market would infringe the Patent." (Doc. #64 page 5)

However, Marvel's references to Mr. Grabb's opinion are irrelevant and incomplete.  The question is not what Mr. Grabb said or what his opinion may have been, but whether the unambiguous language of the Agreement violates federal patent law.  Furthermore, what defendant fails to mention is Mr. Grabb's subsequent deposition testimony:

> Q.  (By Mr. Fleisher)   When you sent -- or, first of all, let me ask you, is this a copy of an e-mail string that you sent to Mr. West and to Mr. Kimble on January 9, 2008?
> A. (By Mr. Grabb) Yes.
> Q.  At the time you sent Exhibit C, was it your belief that the products that were currently being sold by Hasbro infringed the toy web-shooting glove patent?
> A. Yes.
> Q.  Is there something that has occurred between then and now to change your view?
> A. Yes.
> Q.  What has occurred?
> A.  Well, I was operating under two false premises.  One is I thought that any product -- and you have to remember that the litigation took place long before, and I'm not a patent attorney, but I was under the impression that if a toy had a glove, it was an infringement.  I was also under the impression that every toy that came out since the litigation had a glove.  I was wrong on both those accounts.
> Q.  Was the existence of the glove the essential part of the patent, as you understood it?
> A. As I understood it when I wrote this, right.

- 17 -

Q.  And is it your understanding that if a product didn't have a glove, it would not infringe the patent?

A.  If the product --

Q.  Or, let me state it differently.  Could the patent have been infringed in any respect if the product at issue didn't have a glove?

A.  I'm not a patent attorney.  My understanding is that it has to not only have a glove -- if it doesn't have a glove, I don't believe it can infringe the patent.

(SOF #7 to Plaintiffs' Additional Statement of Facts)

Mr. Grabb has testified that he was mistaken and that the toys at issue did not infringe the patent.  Defendant has also admitted that the toys at issue did not infringe the patent. (Doc. #49 Exhibit 7)  Therefore, the issue of infringement is moot. The question before the Court on this *Motion* is whether any part of the Agreement violates federal patent law.  As plaintiffs' *Motion* and *Reply* on this issue establish, nothing in the Agreement does.

## IV.  Plaintiffs' Fourth Motion for Summary Judgment: Regarding Defendant's Third Counterclaim (Extra Items)

Plaintiffs' fourth *Motion for Summary Judgment* concerns Marvel's claim that it overpaid plaintiffs for Web Blasters that had other items packaged with the toy.  For example, Marvel sold a "Dual Action Web Blaster" that came with a "water blaster attachment" and two cans of web fluid, a "Special Dual Action Web Blaster" that came with a "water blaster attachment" and six cans of web fluid, a "Mega Blast Web Shooter" that came with a "triple stream water tank" and a "Spiderman mask with light up spider sense eyes", a "Triple Action Web Blaster" that came with a "water blaster", a "rapid fire missile launcher", five "foam tipped missiles" and five "Spidey suction cup missiles". (SOF #8 to Plaintiffs Additional Statement of Facts)  In all cases, the added items pertain to the concept of the role playing toy.

In their *Motion*, plaintiffs again argue that the Agreement is unambiguous and requires payment for net product sales.  The Agreement contains no language authorizing a discount for items Marvel chooses to package with the Web Blaster. Plaintiffs further argued that, if the Court found otherwise, the uninterrupted course of performance for almost seven years demonstrates the intent of the parties not to discount payment for the Web Blaster because of added items.

In its *Opposition*, Marvel is again faced with the problem of the parties' lengthy history of performance under the Agreement reflecting almost seven years of never having deducted a penny for extra items.  As a result, it again attacks the settled principle of law requiring examination of uninterrupted course of performance and attempts to create an issue of fact.

Marvel first argues "As with plaintiffs' second motion, there are disputed issues of material fact whether Marvel's past payments amount to a course of performance." (Doc. #59, pg. 26)  Plaintiffs incorporate their earlier response to this frivolous argument.   In particular, Marvel sold Web Blasters with added items from 2001 through 2007 without ever deducting a penny from the 3% royalties paid to plaintiffs. (Doc. # 50, Exhibit 2, 3)

Marvel then makes the following argument,

> Furthermore, if the Court considers extrinsic evidence, this motion requires resolving the additional fact as to whether Marvel is obligated to pay royalties on extra value items which **Hasbro, not Marvel chooses to package with Web Blasters.** (ASOF ¶ 22).  Contrary to plaintiffs' assertions (Doc. No. 50 at p. 6), **Marvel is no longer the decision maker with respect to what toys are sold. (*Id.*)  Hasbro now chooses what toys to make and sell and makes the final decision on how the toys are packaged.**

(Doc. #59, pg. 26)  (Emphasis added.)

Whether Marvel or Hasbro makes the decision to include added items with the Web Blaster, it is an undisputed fact that Marvel has always paid plaintiffs on the entire product regardless of whether it contained added items, thereby establishing a long-term uninterrupted course of performance.  In addition, now that Hasbro makes the toy, Hasbro pays Marvel on the entire product regardless of whether it contains added items. (Doc. #50, Exhibit 5)  Therefore, if the Court finds as a matter of law that the parties' course of performance controls, it follows that Marvel is not entitled to a deduction.

### V.  Plaintiffs' Fifth Motion for Summary Judgment (Net Product Sales)

Plaintiffs' fifth *Motion for Summary Judgment* addresses the definition of "net product sales" as used in the Agreement.    At the time plaintiffs executed the Agreement, they understood the term mean 93% of gross product sales. (Doc #51 Exhibits 3, 4) This belief was based upon the undisputed deposition testimony of David Fremed, Marvel's Chief Financial Officer.  This understanding was borne out by Marvel's course of performance over the entire period of the Agreement.  For almost seven years Marvel used 93% of gross product sales as "net product sales".  This changed only in 2007 when Hasbro, rather than Marvel, began manufacturing the Web Blaster.  (SOF #8 to Plaintiffs' Additional Statement of Facts)

In its *Opposition,* Marvel again sets forth what it contends are disputed issues of fact regarding this issue.  Marvel makes much of plaintiffs' assertion that Marvel intended to have Hasbro sign the T.T.S.A. (an agreement that would have obligated Hasbro to pay royalties to plaintiffs directly) and argues that plaintiffs can scarcely speak to what Marvel's intentions were.  (Doc. #59, pg. 27)  Despite the overwhelming

evidence that shows Marvel in fact intended to have Hasbro sign such an agreement (SOF #11 to Plaintiffs' Reply to Defendant's Response to Plaintiffs' July 6, 2009, Statement of Facts) this point is irrelevant to the issue of "net product sales."

Marvel also argues,

Plaintiffs also assert that David Fremed ("Fremed"), former chief financial officer of the Toy Biz division of Marvel, testified that "net product sales" was defined as 93% of gross product sales. (See Doc. No. 51). This assertion is false. David Fremed testified that "net sales" has often been interpreted as 93% of "invoiced sales" at a time when Marvel was still making toys. (RSOF #5 ¶ 3). **Although it may seem like a technicality, "net sales" and "net product sales" may be completely different terms depending on a particular agreement, which would require this Court's inquiry.**

(Doc. #59, pg. 27)  (Emphasis added.)

Despite this argument, the particular agreement at issue is the Agreement between the parties and defendant has offered absolutely no evidence that the term "net product sales" as used in the Agreement means anything other than 93% of gross product sales.   Defendant further argues that "Marvel's traditional 7% for 'P&L allowance' may have been appropriate for Marvel when it sold toys, . . ." but may no longer be appropriate for Hasbro.  (Doc. #59, pg. 28)  By Marvel's own admission, when the parties entered into the Agreement, the 7% P&L allowance was appropriate and has been followed consistently prior to the present controversy. (SOF #6 to Plaintiffs Reply to Defendants Response to Plaintiffs' July 8, 2009 Statement of Facts)

Marvel next argues that that the Agreement applies only to Marvel's sales and not Hasbro's.  As noted above, this position is untenable.

In its *Opposition*, defendant further argues, "If this Court determines that the term "net product sales" is ambiguous, plaintiffs' non-patent summary judgment

motions must be denied."  (Doc. #59, pg. 19)  Once again, there are no disputed material facts other than bald conclusory assertions.

Marvel then argues, "Reliance on a party's course of performance to interpret an ambiguous term in the Agreement necessitates a factual inquiry."  It then cites *Welles v. Turner Entm't Co.*, 503 F.3d 728 at 734 (9th Cir. 2007), 'The interpretation of a contract is a question of law that we may decide **unless the interpretation depends on the credibility of extrinsic evidence**, in which case the interpretation of the contract is the *task of the factfinder*. (emphasis added) (citation omitted).' (Doc. #59, pg. 20)  (Emphasis added.)

In this case, the interpretation of the Agreement does not depend on the "credibility" of the extrinsic evidence.  The uninterrupted course of performance during the term of the Agreement is undisputed.

Marvel next argues,

A significant aspect of the factual inquiry is whether the performance even amounts to a course of performance that a court may use in interpreting an ambiguous term. *See Jones v. Am. Law Book Co.*, 125 A.D. 519, 521-22, 109 N.Y.S. 706, 710 (1st Dep't 1908) (the rule of practical interpretation does not apply where the acts of the parties do not suggest a practical construction of the contract).

(Doc. #59, pg. 20)

Clearly the course of performance by defendant in the instant case, in the event this Court finds an ambiguity, demonstrates a practical construction of the contract. Defendant has offered no facts which show otherwise, nor has it argued otherwise.

Defendant correctly cites *Old Colony Trust Co. v. City of Omaha,* 230 U.S. 100, 118 (1913), which supports plaintiffs' position. "'[T]he practical interpretation of a contract by the parties to it for *any considerable* period of time before it comes to be

the subject of controversy is deemed of great, if not controlling, influence.') (emphasis added)."  The performance took place over a period of time that covered the entire length the Agreement had been in place prior to it becoming the subject of controversy.  That was a period of six and one half years.  Defendant has failed to offer one fact that disputes this considerable time frame.

**Conclusion**

The Agreement at issue is clear and unambiguous.  For almost seven years the parties have understood it and abided by it.  In 2007, a series of events took place that caused Marvel to unilaterally change its performance under the Agreement.  It entered into an agreement with Hasbro and seemingly neglected to have Hasbro assume its obligations to pay plaintiffs.  After its unsuccessful attempts to get Hasbro to assume these obligations, it undertook a campaign to reduce its payments to plaintiffs.  For the first time ever it began imposing deductions for multi-functions.  Then, also for the first time ever, it began imposing deductions for added items. For the first time since the signing of the Agreement it reduced net product sales from 93% of gross sales to 82.7%.  When plaintiffs audited Marvel and then filed suit, it cut payments from 3% of Hasbro's net product sales, to 3% of Marvel's profit.   It then changed its position again and retaliated by reducing the payments to zero and demanding reimbursement of more than 1 million dollars.

There is no ambiguity.  Plaintiffs are entitled to summary judgment on each and every one of their claims.  What is more, plaintiffs are entitled to costs, interest and fees for having to defend against the Marvel malicious attempts to break them.

RESPECTFULLY SUBMITTED  this 14th day of September, 2009.

**KimbleGrabb, PLLC**


by  s/Robert Grabb

Robert Grabb, Esq.
Attorneys / Plaintiffs / Counter Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Andrew Jacobs
Snell & Wilmer, LLP
ajacobs@swlaw.com

Joe Kroeger
Snell & Wilmer, LLP
jkroeger@swlaw.com

David Fleischer
Paul, Hastings, Hanofsky & Walker LLP
davidfleischer@paulhastings.com

s/Robert Grabb