# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephen Kimble and Robert Grabb, ) | |
| Plaintiffs, ) | No. CV-08-372-TUC-DCB-DTF |
| ) | |
| vs. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Marvel Enterprises, Inc., ) | |
| Defendant. ) | |
| ) | |

    Pending before the Court are Plaintiffs' five Motions for Summary Judgment and Defendant's Motion for Summary Judgment. (Dkts. 47-51, 54.) Both parties have filed responses and replies. (Dkts. 59, 63, 64, 67.) Pursuant to the Rules of Practice in this Court, the matter was assigned to Magistrate Judge Ferraro for a report and recommendation. The Magistrate Judge recommends the District Court, after its independent review of the record, enter an order granting Defendant's motion on termination of royalties when the patent expires, granting Plaintiffs' motion on the definition of "net product sales," and denying Plaintiffs' four other motions.

**I**

**PROCEDURAL BACKGROUND**

    In 1997, Plaintiff Kimble filed suit against Toy Biz (the predecessor of Marvel) in this Court, *Kimble v. Toy Biz, et al.*, No. CV97-557-TUC-RCC (the 1997 Action), alleging patent infringement and breach of contract based on an alleged oral agreement. The patent claim was resolved on a motion for summary judgment in favor of Marvel. Thereafter, Kimble obtained a judgment against Toy Biz on the contract claim. Both parties appealed.

In 2001, while the appeals were pending, the parties entered a settlement agreement (Agreement). In 2008, Plaintiffs filed this action, alleging breach of the Agreement.[1] (Dkt. 1, 23.) Defendant counterclaimed seeking a declaratory judgment and alleging unjust enrichment. (Dkt. 33.) After completing discovery, the parties filed the instant motions. On November 6, 2009, the Court heard oral argument on the motions.

## II

## MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must produce evidence and persuade the court there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A material fact is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Id.* at 250. When the moving party has carried its burden under Rule 56(c), the nonmoving party must produce evidence to support its claim or defense by more than simply showing "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, the court presumes the nonmoving party's evidence is true and draws all inferences from the evidence in the light most favorable to the nonmoving party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). Each numbered paragraph of the moving party's separate statement of facts shall be deemed admitted for purposes of the motion for summary judgment if not specifically controverted by a correspondingly numbered paragraph

---

[1] Plaintiffs' complaint also alleged bad faith, fraud, and unjust enrichment. The parties stipulated to dismissal of those counts. (Dkt. 29.)

1  in the opposing party's separate statement of facts.  LRCiv 56.1(b).

## III

## DISCUSSION

Plaintiffs moved for summary judgment on Defendant's Counterclaims 1(a), 2, 3, 4, and the definition of "net product sales" in the Agreement.  Defendant moves for summary judgment on its Counterclaim 1(a).

### A. Relevant Undisputed Facts[2]

Kimble is the inventor of a web shooting toy described in U.S. Patent No. 5,072,856. (Dkt. 49-3.)  The Kimble patent expires no later than May 25, 2010.  (Dkt. 33, ¶ 31; Dkt. 44, ¶ 1.)  The 1997 Action, *Kimble v. Toy Biz, et al.*, No. CV97-557-TUC-RCC, alleged patent infringement and breach of an oral contract.  (Dkt. 49-4.)  Kimble alleged that in 1990 he met with Toy Biz president Lou Schwartz to discuss Kimble's patent application and related ideas.  At that meeting, Schwartz agreed that Toy Biz would not use the ideas disclosed by Kimble without first negotiating a reasonable royalty payment for their use.  (*Id.*, ¶¶ 26, 27.)

Kimble also alleged in the 1997 Action that Toy Biz subsequently made and sold a "Web Blaster" toy based on Kimble's ideas, but refused to pay Kimble any royalty.  (*Id.*, ¶ 30.)  The Web Blaster is a role play toy whose primary play value is to allow the user to adopt aspects of Marvel's Spider-Man character by shooting foam string.  (Dkt. 56-2 at 4.) The District Court ruled as a matter of law that the Web Blaster did not infringe the Kimble patent, but that the claims concerning the verbal agreement involved disputed issues of fact for a jury to decide.  (Dkt. 49-5.)

After a jury trial on the breach of contract claim, the District Court entered judgment in favor of Kimble and against Toy Biz, finding that the Web Blaster was covered by the verbal agreement and awarding "the full damages to be 3.5% of net product sales, past,

---

[2] The relevant undisputed facts were taken from the parties' statements of facts, responses, and replies thereto.  (Dkts. 47-1, 48-1, 49-1, 50-1, 51-1, 55, 60, 63-1, 66, 67-1.)

- 3 -

present and future excluding refill royalties." (Dkt. 49-6.) Both parties appealed the judgment.

While appeal was pending, on September 21, 2001, Plaintiffs Kimble and Grabb (the "Patent Holders")[3] entered the Agreement with Defendant Marvel to end the pending litigation. (Dkt. 47-3.) Thereafter, the appeals were withdrawn and the judgment vacated. (*Id.* at 3.) The key provision of the Agreement relevant to the instant matter provides:

> 3. Marvel agrees to purchase from the Patent Holders and the Patent Holders agree to sell to Marvel the Patent which will be evidenced by an instrument of assignment in the form of exhibit C hereto. The purchase price for the Patent shall be payable to the Patent Holders as follows:
>
> a. $516,214.62 upon execution and delivery of this Agreement; and
>
> b. 3% of "net product sales" (as such term is used in the Judgment) excluding refill royalties made after December 31, 2000. For purposes of this paragraph 3.b, "net product sales" shall be deemed to include product sales that would infringe the Patent but for the purchase and sale thereof pursuant to this Agreement as well as sales of the Web Blaster product that was the subject of the Action and to which the Judgment refers.

(*Id.* at 4.) The Agreement contains no expiration date.

David Fremed, Toy Biz CFO, testified in the 1997 Action that "net sales" in the industry meant "gross sales of certain products less some reserve associated with deductions, discounts, returns, allowances." Marvel used a fixed 7% as that reserve, a "P&L allowance." (Dkt. 51-4 at 3-5; Dkt. 62-8 at 7; Dkt. 62-2 at 4.) During 2001-2006, Marvel paid 3% royalties on 93% of the invoiced sale of Web Blasters, taking 7% off as a "P&L allowance." (Dkt. 61, ¶ 4; Dkt. 51-4 at 5-6.)

On January 6, 2006, Marvel entered a licensing agreement with Hasbro. (Dkt. 73 (sealed).) The licensing agreement gave Hasbro copyright and trademark rights for Marvel characters in certain toy categories, including role-play toys. (Dkt. 50-6 at 3.) Hasbro began making versions of the Web Blaster pursuant to the licensing agreement in 2007. (*Id.* at 5.)

---

[3] Robert Grabb is not on the patent application nor was he a party to the 1997 Action, rather, he acted as Kimble's attorney during that proceeding. He is a signatory of the Agreement and a party to the instant case.

- 4 -

While negotiating the Agreement, the parties never discussed what would happen if Marvel stopped making Web Blasters and entered into a licensing agreement. (Dkt. 62-1 at 9.)[4]

Between August 2006 and May 2007, Marvel negotiated with Hasbro to sign a Toy Technology Sublicense Agreement, which would have obligated Hasbro to pay Plaintiffs the royalties owed under the Agreement; Hasbro declined to sign the sublicense. (Dkt. 50-6 at 13-14; Dkts. 50-8, 50-9.) Since 2007, Hasbro has sold several versions of the Web Blaster, some of which are packaged in kits with "Extra Value Items." (Dkt. 62-10 at 6-15.) Hasbro also has been selling the Ultimate Web Blaster, which rotates through five shooting functions. (Dkt. 62-10 at 7-15; Dkt. 62-11.) Since 2007, Hasbro has reported quarterly to Marvel the units sold (Dkt. 62-8 at 6) and has paid Marvel royalties amounting to 10% of net sales of the licensed products (Dkt. 50-6 at 10-11).

Up until May 2008 (which included payments for all of 2007), after the resolution of some disputes, Marvel paid Plaintiffs 3% of Hasbro's net sales of various Web Blaster products. (Dkt. 67-35; Dkt. 50-4, ¶ 6; Dkt. 50-5, ¶ 6; Dkt. 60 at 10, ¶ 7; Dkt. 61, ¶ 8.) These royalties included payments for Web Blaster kits with Extra Value items. (Dkt. 50-4, ¶ 6; Dkt. 50-5, ¶ 6; Dkt. 50-2 at 2, ¶ 7; Dkt. 60 at 10, ¶ 7; Dkt. 61, ¶ 7.) Plaintiffs exercised their right to audit Marvel's financial records with respect to the 2007 net product sales. (Dkt. 23, ¶ 12; Dkt. 33, ¶ 12.) On May 23, 2008, Marvel informed Plaintiffs they were not entitled to royalties on Extra Value Items and Marvel had recalculated 2007 royalties and determined Marvel had overpaid Plaintiffs by $282,700. (Dkt. 62-4.)

**B. Whether, as a Matter of Law, Marvel Owes Royalties Under the Agreement After the Patent Expires**

Both Plaintiffs and the Defendant seek summary judgment on the issue of whether royalty payments extend beyond the patent's expiration, May 25, 2010 (Counterclaim 1(a)). Plaintiffs contend royalties are due under the Agreement for as long as Marvel receives revenue for Web Blaster sales. Defendant argues the royalty provision in the Agreement is

---

[4] Marvel has not manufactured or directly marketed any Web Blasters since prior to 2007. (Dkt. 60 at 20, ¶ 21; Dkt. 67-1 at 17, ¶ 21.)

- 5 -

1  unenforceable after the patent expires. The opposing motions demonstrate that both parties
2  agree there is no issue of material fact and summary judgment is appropriate. The Court
3  agrees that this is purely a legal question.

4        The seminal case on this issue is *Brulotte v. Thys Co.*, 379 U.S. 29, 32 (1965), which
5  held that "a patentee's use of a royalty agreement that projects beyond the expiration date of
6  the patent is unlawful per se." In *Brulotte*, a patent-owner sold a hop-picking machine for
7  a flat fee and issued a license, which made payable an annual royalty and also precluded
8  assignment of the license or removal of the machine from the county. 379 U.S. at 29. The
9  Court found the licensing agreement unenforceable after expiration of the patent because to
10 conclude otherwise would allow assertion of the monopoly power of the patent beyond its
11 term. *Id.* at 33. The Court distinguished the situation from ones in which non-patented items
12 are priced based on long-term use or in which different arrangements would apply before and
13 after the expiration of a patent. *Id.* at 31-32. The Court emphasized that because the terms
14 were the same both before and after expiration of the patent, they were "unable to conjecture
15 what the bargaining position of the parties might have been and what resultant arrangement
16 might have emerged had the provision for post-expiration royalties been divorced from the
17 patent and nowise subject to its leverage." *Id.* at 32.

18       The Court subsequently distinguished a situation in which an inventor and a
19 manufacturer entered two agreements, one for a 5% royalty for the item in the inventor's
20 pending patent application, and the second for a 2 ½% royalty if the patent application was
21 not allowed within five years. *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 259 (1979).
22 The Court distinguished *Brulotte* because the contract for a 2 ½% royalty did not rely on a
23 patent. *Id.* at 262 (finding that federal law did not preempt state contract law in this
24 situation). The reduced royalty was negotiated for the express purpose of compensation in
25 the absence of a patent. Hence, the *Aronson* agreement did not offend the principle
26 emphasized in *Brulotte* – it is unlawful to leverage a patent monopoly beyond its expiration.
27 *Id.* at 265. The Court noted that "[n]o doubt a pending patent application gives the applicant
28

some additional bargaining power for purposes of negotiating a royalty agreement," which cannot extend beyond a patent term; however, because the lower royalty rate was negotiated for the express contingency of no patent, it was enforceable. *Id.*

Plaintiffs rely on *Zila, Inc. v. Tinnell*, 502 F.3d 1014 (9th Cir. 2007), to support their argument that this Court should give effect to the parties' intent that the royalty continue as long as the toys are sold. *Zila* is the leading Ninth Circuit case on this issue and it involved a contract intended by the parties to, and drafted to, grant a 5% royalty in perpetuity on sales of a herpes treatment in exchange for all rights to the treatment, including any future patents (four of which were eventually obtained). 502 F.3d at 1016. Contrary to Plaintiffs' argument, the Ninth Circuit was unable to enforce the parties' intent because it found that "*Brulotte* preempts state law with regard to a contract for payment of royalties on the sale of an invention that may be patented, if a patent indeed issues." *Id.* at 1020, 1022. Thus, *Zila* illustrates that *Brulotte* may override the parties' intent regarding the length of a royalty provision.

Here, the parties are in accord that the Agreement provided for the sale of a patent right.[5] Whether the Agreement also transferred non-patent rights is less clear. The plain language of paragraph three of the Agreement provides that the only right Plaintiffs transferred to Marvel was the patent. "The purchase price for the Patent shall be" royalty payments for two categories of toys (infringing and the Web Blaster previously litigated). (Dkt. 47-3, ¶ 3.) Although royalties are due for sales of the Web Blaster, there is no release or transfer relating to the Web Blaster. In fact, paragraph 9 of the Agreement provides: "Except for the obligations undertaken by Marvel in this Agreement and except for those obligations under the alleged verbal agreement that was the subject of the Action, the Patent Holders hereby release and discharge Marvel . . . ." (Dkt. 47-3, ¶ 9.) Plaintiffs contend this language demonstrates the Agreement provided obligations separable from the patent.

---

[5] Plaintiffs' attorney reaffirmed the Agreement provided for the sale of Plaintiff's patent at oral argument.

- 7 -

1  Although Plaintiffs may have reserved non-patent rights, the Agreement does not clearly
2  transfer any of these non-patent rights. Paragraph nine more reasonably suggests that
3  Plaintiffs reserved the non-patent rights from the verbal agreement and did not transfer them
4  to Marvel.

5  The plain language of the Agreement clearly relies on a patent and does not have
6  separate provisions for non-patent rights, the distinction made by *Aronson*.  Because the
7  Agreement is premised on a patent, *Brulotte* controls and the royalty cannot extend beyond
8  the life of the patent.

9  Despite the plain language of the Agreement, both parties interpret the Agreement as
10 transferring the patent right <u>and</u> the rights to the toy idea(s) verbally exchanged between
11 Kimble and Toy Biz in 1990.  At oral argument, Defendant could not identify any language
12 in the Agreement that transferred a non-patent right.  Nevertheless, Defendant asserted the
13 transfer of non-patent rights was implicit in the Agreement.  Because the parties are in
14 agreement, and the outcome is the same whether the Agreement transferred only patent rights
15 or both patent and non-patent rights, the Court will also assess the latter possibility.

16 Plaintiffs contend that, pursuant to the royalty provision of the Agreement there are
17 separable rights, "patent rights" and "non-patent rights."  Under their interpretation, in
18 consideration for non-patent rights there is a 3% royalty on the non-infringing toys, which
19 is distinct from the 3% royalty for infringing toys.  They agree that no royalties would be due
20 for infringing products after the expiration of the patent, but argue for the continuation of
21 royalty payments for toys not tied to the patent.  Defendant contends there is no distinction
22 between royalties for patent rights and those for non-patent rights.  Therefore, they conclude
23 the Agreement is a hybrid under the law.  To the extent the Agreement can be interpreted as
24 transferring non-patent rights, the Court agrees with Defendant.

25 In *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1371-72 (11th Cir. 1983), the circuit
26 court emphasized that a "hybrid" agreement providing royalties for patent rights and trade
27 secrets was no different than *Brulotte* which licensed both patent rights and "use."  Because

28

- 8 -

restrictions and royalties applied the same before and after the expiration of the patent, which indicates the projection of the patent monopoly beyond its period, the agreement was unenforceable beyond the patent expiration. *Id.* at 1373. The Sixth Circuit followed the Eleventh, holding, "enforcement of royalty provisions for other rights which conflict with and are indistinguishable from royalties for patent rights, is precluded." *Boggild v. Kenner Products*, 776 F.2d 1315, 1319 (6th Cir. 1985). Here, the Agreement does not distinguish royalties for the patent from those paid for non-patent rights, or royalties before and after the patent expires.

   The inseparability of the rights transferred is illustrated by the history of the Agreement. When the Agreement was executed, Plaintiffs believed Marvel was infringing their patent and were pursuing an appeal to vindicate this belief. Thus, patent rights and infringement were still in dispute and the parties entered into the Agreement to settle all issues, patent and contract, in order "to avoid the further expense and distraction of litigation." (Dkt. 47-3 at 2, ¶ E.) To that end, the Agreement included a royalty for certain toys, infringing or not. Since the signing of the Agreement, the parties have continued to take various positions on whether any toys sold would have infringed the patent. (Dkt. 48-7 at 10-11; Dkt. 56-2 at 5-7; Dkt. 67-36 at 3-4; Dkt. 67-37 at 6.) The Agreement created no distinction, nor has one been made by the parties, for royalty payments for infringing versus non-infringing toys.

   Although conceding the patent was part of the bargain at oral argument, Plaintiffs contended that their leverage in negotiating the Agreement was the judgment not the patent. As noted above, the issue of patent rights and infringement were actively in dispute and the Agreement was negotiated to settle those issues. The Sixth Circuit held in *Boggild* that when anticipated patents are used as leverage to negotiate a royalty agreement, regardless of the fact that the application has not been filed, *Brulotte* invalidates the agreement to the extent it extends beyond expiration of the eventually-issued patent. 776 F.2d at 1319. The Seventh Circuit has similarly held that a contract transferring an "invention" and the right to seek a

1  patent for the invention, triggers *Brulotte* once a patent issues because the patent possibility
2  put the inventor in a stronger bargaining position. *Meehan v. PPG Indust., Inc.*, 802 F.2d
3  881, 885 (7th Cir. 1986). Here, because a patent was used as leverage to negotiate the
4  Agreement, which transferred the patent rights, it fits squarely within the parameters of
5  *Brulotte*. *See Aronson*, 440 U.S. at 265.

6  Accordingly, the Court finds the Agreement is governed by *Brulotte* and the royalty
7  provision is unenforceable after expiration of the patent. This is true if the Agreement is
8  interpreted as transferring only a patent right, in which case the royalty provision is clearly
9  premised on a patent, or if the Agreement is a hybrid and transfers patent and non-patent
10 rights for royalties that are inseparable between the two rights.

### C. Whether, as a Matter of Law, "Net Product Sales" is Defined

12 Plaintiffs seek summary judgment on the definition of the term "net product sales" in
13 the Agreement. Plaintiffs contend that "net product sales" means 93% of gross product sales.

14 The Agreement is governed by New York law. (Dkt. 47-3 at 7, ¶ 14.) When
15 interpreting a contract, the goal is to give effect to the parties' intent. *Hartford Accident &*
16 *Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973). "Whether an agreement is
17 ambiguous is a question of law for the courts." *Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y.
18 1998). Here, the Agreement is ambiguous because "net product sales" is not defined. The
19 Agreement only provides that the term is used as it "is used in the Judgment," (Dkt. 47-3, ¶
20 3.b) but that term is not defined in the judgment. If a contract is ambiguous, courts may
21 consider extrinsic evidence to interpret it.[6] *Hartford Accident & Indem.*, 305 N.E.2d at 909.

---

[6] Relying primarily on New York law, Defendant suggests that if the Court has to look to extrinsic evidence, disputed issues of fact are necessarily implicated and summary judgment is precluded. (Dkt. 59 at 19, 20.) First, although New York law governs the substantive contract issues before the Court, such as which facts are material, the ultimate question, whether there is a genuine dispute of fact, is assessed under federal standards. *See Anderson*, 477 U.S. at 248-49 (the court determines if there is a factual issue that a jury could reasonably resolve in favor of either party). Second, New York law does not require such a rule. *See Federal Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44-45 (N.Y. App. Div. 1999) (when the moving party sets forth extrinsic evidence of the parties' intent and the

The available extrinsic evidence includes testimony in the 1997 Action defining "net product sales" and the parties' course of performance. The CFO for Toy Biz, David Fremed, testified in a deposition for the 1997 Action that in the industry "net sales" is "gross sales of certain products less some reserve associated with deductions, discounts, returns, allowances." (Dkt. 51-4 at 3-5.) Marvel used a fixed 7% for that reserve, referred to as a "P&L allowance." (*Id.*) Plaintiffs believed, at the time they entered the Agreement, that "net product sales" meant 93% of gross product sales. (Dkt. 51-5, ¶1; Dkt. 51-6, ¶1.) The same definition for net sales provided by Fremed was reiterated by other Marvel executives in depositions for this case. (Dkt. 62-8 at 7; Dkt. 62-2 at 4.)

From 2001 to 2006, Marvel paid Plaintiffs 3% royalties on 93% of the invoiced sales of Web Blasters, taking 7% off as a "P&L allowance." (Dkt. 61, ¶ 4; Dkt. 51-4 at 5-6.) "The parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.'" *Federal Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44 (N.Y. App. Div. 1999) (the parties' interpretation for "any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.").

Marvel argues that, with respect to a particular agreement, the term "net sales" to which Fremed testified might be a "completely different term" from "net product sales." While "net sales" and "net product sales" might not have the same meaning in varying contexts, Marvel's contention that they did not mean the same thing as to the Agreement between the parties is unsupported. Testimony by Marvel executives does not establish any distinction between net sales and net product sales, at least with respect to this Agreement. (Dkt. 62-2 at 4.) To the contrary, Marvel confirms that it paid royalties on 93% of invoiced sales through 2006 when it was selling toys. Marvel does not contend that these payments were erroneous or that was not the intended definition. Rather, it makes the conclusory

---

responding party does not provide any conflicting evidence, summary judgment is properly granted).

- 11 -

argument that "this does not establish that 93% of the 'invoiced sales' is the definition of 'net product sales' as an undisputed fact." (Dkt. 59 at 28.) Defendant does not provide any conflicting evidence or any other definition the parties may have intended. An unsupported assertion is insufficient to create a "genuine issue for trial." *Matsushita*, 475 U.S. at 586-87.

Marvel further argues that 93% is no longer the appropriate number because, since 2007, Hasbro has been the decision-maker regarding the packaging and selling of the toys. Up until Hasbro began selling the Web Blaster there was no dispute that "net product sales" meant 93% of gross product sales. Marvel provides no explanation or evidentiary support for how their licensing agreement with Hasbro, effective in 2007, alters what the parties intended the term "net product sales" to mean in their 2001 Agreement.[7]

In sum, Plaintiffs set forth undisputed facts regarding what the parties understood "net product sales" to mean at the time they entered the 2001 Agreement, and how it was used in royalty payments up through 2006. It was consistently interpreted to mean 93% of gross product sales. Marvel has not produced any conflicting evidence to alter that definition. Thus, summary judgment for Plaintiffs is appropriate.

### D.   Whether, as a Matter of Law, Marvel Owes Royalties Under the Agreement For Hasbro's Net Product Sales

Counterclaim 2 alleges that Marvel mistakenly paid Plaintiffs for Hasbro's sales in 2007, unjustly enriching Plaintiffs, when the Agreement did not require payments for sales by Hasbro.[8] Plaintiffs seek summary judgment on their entitlement to royalties for Hasbro's

---

[7] Defendant points to Plaintiffs' assertion that, since 2007, Marvel has paid royalties on 87.2% of Hasbro's gross sales of Web Blasters, not on 93% (Dkt. 62-9 at 4). In addition to the fact that this unproven, it is not material to resolving the parties' intention as to the definition of "net product sales" in the 2001 Agreement.

[8] In relation to this claim, Plaintiffs contends the Hasbro license amounts to an assignment of Marvel's rights under the Agreement; Defendant disagrees. Whether any rights were legally assigned to Hasbro, the parties agree that no duties relative to the Agreement were assigned. (Dkt. 47 at 5; Dkt. 59 at 14; Dkt. 67 at 9.) Resolution of whether there was an assignment of rights to Hasbro is irrelevant because any duty remains with Marvel.

sales of toys. As discussed in more detail below, the Court finds there are triable issues of fact regarding whether the toys manufactured by Hasbro are within the scope of the Agreement.

The plain language of the Agreement obligated Marvel to pay a 3% royalty to Plaintiffs for any products within the two categories specified by the Agreement – products that would infringe the patent and the Web Blaster litigated in the prior Action. The Agreement has no limitations based on who is manufacturing and/or marketing the products. Contrary to Marvel's contention, this would not obligate it to pay for sales by an unrelated third-party. A third-party with no relationship to Marvel could not legally manufacture a toy within either of these categories because Marvel owns the patent and it owns the right to Spider-Man, and the Web Blaster is a Spider-Man toy. Thus, Marvel has complete control over the sale of any toys within those two categories.

Under the licensing agreement, Marvel receives 10% of Hasbro's net sales for the use of the Spider-Man license and trademark. (Dkt. 50-6 at 3, 10.) Marvel argues that continuing its 3% royalty obligation to Kimble would lead to an absurd result requiring Marvel to pay 30% of the royalties they received from Hasbro to Plaintiffs. If this is an absurd result, it was created by Marvel with full knowledge of its obligations under the Agreement.[9] Additionally, the 30% figure on which Marvel relies has little meaning in the abstract. There is no evidence in the record regarding Marvel's profit when it manufactured the Web Blaster, and the percentage of that paid to Plaintiffs, versus its profit as a licensor, and what percentage of that the 3% royalty constitutes.

Marvel's remaining arguments based on the plain language of the Agreement, in support of their position that no royalty is due for Hasbro's sales, are unpersuasive. Marvel argues that it would not be able to provide the information required by the Agreement for a third-party's sales – quarterly reports of net product sales, number of units sold, and price –

---

[9] Marvel apparently attempted to avoid this result by obligating Hasbro to pay Plaintiffs the royalties owed under the Agreement through a Toy Technology Sublicense Agreement. (Dkt. 50-6 at 13-14; Dkts. 50-8, 50-9.)

- 13 -

nor would it have obligated itself to late payment provisions that could be impacted by a third-party. Marvel could control its ability to meet these obligations by including them in the terms of any subsequent licensing agreement, which it did in its agreement with Hasbro. Similarly, Marvel argues that if it owed Plaintiffs for <u>any</u> third-party sales, Plaintiffs' right under the Agreement to examine Marvel's financial records as to net product sales would be rendered meaningless, as those records would contain no relevant information. Because all sales within the Agreement are controlled by Marvel, and Marvel profits from Hasbro's sales, Marvel's records would, and do, provide the relevant financial information. These provisions of the Agreement do not make the existence or nonexistence of an obligation to pay Plaintiffs royalties on Hasbro's net product sales more or less probable. The Court concludes that, under the plain language of the Agreement, Marvel owes Plaintiffs a 3% royalty for anyone's product sales covered by the Agreement.

Notwithstanding this finding, there remains an ambiguity precluding summary judgment – whether any toys sold by Hasbro come within the toy categories covered by the royalty provision of the Agreement. Whether Hasbro sold any toys that would infringe the patent is a legal issue not before the Court. Also, there are genuine issues of fact regarding whether any toys sold by Hasbro are properly categorized as the "Web Blaster product that was the subject of the Action and to which the Judgment refers." Although the toy that was litigated during the 1997 Action was one specific version of the Web Blaster, Marvel has made royalty payments to Plaintiffs for many later-developed versions of the Web Blaster. Thus, determining what toys the parties intended to be covered by the Agreement will require examining the course of performance and the specific toys for which royalties are in dispute. In particular, as discussed below, the parties dispute whether Hasbro's Ultimate Web Blaster is entirely within the terms of the Agreement. Additionally, Marvel made payments to Plaintiffs for sales by Hasbro in 2007 (Dkt. 67-35), which it asserts were made in error, and Marvel negotiated, without completing a contract, for Hasbro to take over royalty payments to Plaintiffs (Dkt. 50-6 at 13-14; Dkts. 50-8, 50-9). The relevance of these facts is a matter

for the trier of fact.

Accordingly, Plaintiffs are not entitled to summary judgement on Counterclaim 2.

### E. Whether, as a Matter of Law, Marvel Owes Royalties for Improved Web Blasters and Extra Value Items

Marvel alleges Plaintiffs were overpaid in 2007 for "kits," which included a Web Blaster and Extra Value Items (Counterclaim 3) and improved Web Blasters (Counterclaim 4). Plaintiffs move for summary judgment on both these claims.

Plaintiffs interpret the Agreement broadly and argue the plain language does not allow for a reduction in royalty payments based on improved Web Blaster functions nor does it distinguish between a product that includes Extra Value Items and one that does not. The Court agrees with Defendant that the plain language of the Agreement does not address this situation. Rather, it is ambiguous regarding whether royalties are due for Extra Value Items packaged with a Web Blaster or for Web Blaster versions developed after the 1997 Action. Thus, the Court must assess whether the parties' intent can be discerned from undisputed extrinsic evidence.

With respect to Extra Value Items, Plaintiffs rely on the parties' course of performance from 2001 through May 2008 – Marvel paid royalties on the entirety of kits (Dkt. 50-4, ¶ 6; Dkt. 50-5, ¶ 6; Dkt. 50-2 at 2, ¶ 7; Dkt. 60 at 10, ¶ 7; Dkt. 61, ¶ 7) – as proof that there is no genuine issue of fact.[10] Marvel agrees such payments were made, but asserts they were made in error. Marvel provided a declaration from Kenneth West, Marvel's Chief Financial Officer, who attested that Marvel's payments for Extra Value Items without any deduction or allocation were a mistake, which it did not realize until it entered the licensing agreement with Hasbro. (Dkt. 61, ¶¶ 7, 10.) Marvel's assertion that its payments for Extra Value Items were made in error raises a credibility issue and a question of fact. Whether the course of performance evidences the parties' intent under the Agreement as to sales of Extra Value Items by Hasbro is a factual dispute for the trier or fact precluding summary judgment

---

[10] Web Blasters packaged with Extra Value items were sold with a single SKU number. (Dkts. 50-4, ¶ 3; Dkt. 50-5, ¶ 3; Dkt. 60 at 10, ¶ 4.)

- 15 -

on Counterclaim 3.

With respect to "improved" Web Blasters, Defendant argues Plaintiffs are only entitled to a partial royalty for the Ultimate Web Blaster sold by Hasbro, which it categorizes as the first "multi-function" Web Blaster. Plaintiffs counter that Marvel has always paid full royalties on Web Blasters with multiple functions, such as the Dual Action and Triple Action Web Blasters and the Mega Blast Web Shooter that shot silly string, water, and darts. (Dkts. 67-14 to -17.) Defendant does not dispute that it sold toys with those functions, but claims the Ultimate Web Blaster incorporates all the functions into a single unit and does not require the user to change out canisters to use different functions. The Court cannot resolve on summary judgment whether the Ultimate Web Blaster is factually and functionally distinct from the original Web Blaster or the other products previously sold by Marvel, such that the parties' course of performance is not persuasive evidence of the parties' intent regarding royalty payments for the Ultimate Web Blaster. *See Federal Ins. Co.*, 258 A.D.2d at 44 (the parties' interpretation for "any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.").

Additionally, Marvel contends the attachments for the prior improved versions of the Web Blaster, sold by Marvel, were properly categorized as Extra Value Items for which Marvel should not have made full payment. Because the factual dispute regarding Extra Value Items cannot be resolved on summary judgment, as discussed above, that is another issue of material fact precluding summary judgment regarding the Ultimate Web Blaster. Whether the Ultimate Web Blaster is a product within the scope of the Agreement is a question of fact precluding summary judgment on Counterclaim 4.

Plaintiffs' alternative legal theory of accord and satisfaction with respect to the Ultimate Web Blaster is unpersuasive. According to Plaintiffs, their acceptance of a check from Marvel, after a dispute over royalties for the Ultimate Web Blaster, acted as an accord

- 16 -

1 and satisfaction.[11] *See Patel v. Orma*, 593 N.Y.S.2d 851, 853 (App. 1993) (acceptance of a check in full settlement of a disputed claim amounts to an accord and satisfaction). Acceptance of a check only operates a release if the parties are on notice of such a consequence, *see Sorrye v. Kennedy*, 699 N.Y.S.2d 214, 215-16 (App. Div. 1999), and there is no evidence the parties reached such an understanding regarding the Ultimate Web Blaster. (*See* Dkt. 48-7.) Further, accord and satisfaction requires new consideration and a meeting of the minds. *Id.* at 216 (citing *Komp v. Raymond*, 67 N.E. 113 (1903)). The items Plaintiffs cite as consideration, foregoing interest payments and their right to sue, were never mentioned during the email exchanges. (Dkt. 48-7.) Further, the parties December 2007 to January 2008 email exchanges, which is the only evidence on which the parties' rely, do not establish a meeting of the minds and the execution of a new contract. (*Id.*) Plaintiffs are not entitled to summary judgment on their defense of accord and satisfaction.

## IV

## RECOMMENDATION

Defendant Marvel is entitled to summary judgment as a matter of law on Counterclaim 1(a) – Marvel is not required to pay royalties under the Agreement after the May 25, 2010 expiration of the patent. Therefore, the Magistrate Judge recommends the District Court, after its independent review of the record, deny Plaintiffs' Motion for Summary Judgment (Dkt. 49) on this issue and grant Defendant's motion (Dkt. 54). Plaintiffs have demonstrated there is no genuine issue of material fact regarding the definition of "net" product sales in the agreement – it means 93% of gross product sales. Thus, the Magistrate Judge recommends the District Court, after its independent review of the record, grant Plaintiffs' motion for summary judgment on this issue (Dkt. 51.) There are genuine issues of material fact precluding summary judgment on the issue of sales by

---

[11] On December 13, 2007, Plaintiffs inquired with Marvel's CFO, Ken West, why the Ultimate Web Blaster was not included in the 2007 third quarter report. (Dkt. 48-7 at 2.) After partial payment and further debate (*see* Dkts. 48-7, 48-8), on January 28, 2008, Marvel agreed to pay full royalties for the Ultimate Web Blaster. (*Id.* at 17; Dkt. 48-10.)

Hasbro, improved Web Blasters and Extra Value Items. Therefore, the Magistrate Judge recommends the District Court, after its independent review of the record, deny summary judgment on Counterclaims 2, 3 and 4 (Dkts. 47, 48, 50).

Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. If objections are filed, the parties should use the following case number: **CV-08-372-TUC-DCB**.

DATED this 2nd day of December, 2009.

D. Thomas Ferraro
United States Magistrate Judge